# O'NEIL, MICHAUX & THOMAS v. TEAGUE AND TEAGUE.

1. The declaration of a father, made to his son-in-law, when he delivered to him several slaves, shortly after his marriage, that they were intended for the use of the donor's daughter, and were not given absolutely as an advancement for her, are admissible evidence, where a deed was subsequently executed for the purpose of carrying out the intention.

2. Where a father conveys personal property to third persons, in trust for a married daughter, and delivers the property accordingly, neither the second section of the statute of frauds, or the act of 1823, " to prevent fraudulent conveyances," make registration necessary to its operation against the creditors of the husband.

3. A deed purporting to convey certain slaves from a father to third persons in trust for the " benefit" of a daughter, then recently married, provided that the daughter, together with her husband, were to retain the possession of the slaves, with their increase during coverture, and the natural life of the daughter; should she die without issue, the slaves were to revert to the donor, or his lawful heirs. Thus, as the deed declares, *conveying the legal interest to the trustees in trust, and the possessory interest to the daughter and " the heirs of her body forever*, (if any,) if none, according to the terms before set forth:" *Held*, that the deed conferred upon the husband and wife the possession of the slaves during coverture, and the life of the wife; that upon the death of the wife, the possessory interest of the heirs of her body commences, and the husband being in possession, the slaves were subject to seizure and sale under an execution against his estate.

4. *Semble;* that a father who has settled property upon trustees for the benefit of his daughter, is a competent witness for the trustees in a controversy between them and the creditor of the husband, who is seeking to subject it to the payment of the debts of the latter.

5. Where a written agreement contains more or less than the parties intend-

44

ed, or is variant from the intent of the parties, by expressing something
substantially different, if the mistake is made out by satisfactory proof,
equity will reform the contract, so as to make it conformable to the intent
of the parties. But such extrinsic proof, it seems, is not admissible in the
absence of fraud, or some legitimate predicate on which to rest its admis-
sion.

Writ of error to the Circuit Court of Shelby.

On the 4th of April, 1844, a writ of *fieri facias* was issued
from the Circuit Court of Bibb, at the suit of the plaintiffs in error,
commanding that the sum of $3,096 11 damages, besides costs,
be made of the goods, &c. of James O'Hara, and James C. O'-
Hara. This *fi. fa.* was received by the sheriff of Shelby, on the
2d of May, and on the 16th of the same month levied on two
slaves, viz; Caroline, a slave aged about twelve, and Henry,
about eight years old, as the property of James C. O'Hara.  On
the next day, James D. Teague interposed a claim to these slaves
on behalf of himself and Eldred B. Teague, and gave bond with
surety to try the right, pursuant to the statute.  An issue was
made up in due form, and the question of the liability of the
slaves to satisfy the execution, submitted to a jury, who returned
a verdict in favor of the claimants, and judgment was rendered
accordingly.

On the trial, the plaintiffs in execution excepted to the ruling of
the Court.  It appears from the bill of exceptions, that the plain-
tiffs adduced their execution, and then proved by the sheriff, that
the slaves in question, were at the time of its levy, and before, in
the possession of James C. O'Hara, one of the defendants in exe-
cution ; that the girl Caroline was worth from $300 to $325, and
the boy, Henry, worth about $300.

The claimants then proved, that in the latter part of August,
1843, John W. Teague sent these slaves to his daughter, who,
a short time previously, had intermarried with James C. O'Hara,
designing them as a gift to her, and for her own use during life,
and to her children, (if any,) on her death, if none, then to revert
to him, (the donor,) or his heirs.  The father informed the hus-
band of his purpose, at the time he sent the slaves, and that he
would have a deed made in order to carry it into effect.  To the
admission of the proof as to the donor's object, in making the

gift, and the terms of the gift, as stated by him, the plaintiff objected.

The donor testified that a few days after he had sent the slaves to his daughter, he made the deed of gift; he told the subscribing witness, whom he employed to write it, that he wished to convey the slaves to the trustees, for the sole use of his daughter for life, and her children after her death, but if she died without children, then to revert to himself or his heirs. Plaintiffs objected to all this evidence, and especially to the competency of the donor, on the ground of interest; but their objection was overruled.

The claimants then proposed to read to the jury the deed, which is a deed of gift from the father to the claimants, as trustees of the slaves, Caroline and Henry, for the benefit of Eleanor S., who it is provided, " with her husband, the said James C. are to retain the peaceable possession of said negroes, with their increase during coverture, and during the natural life of the said Eleanor. And should said Eleanor die without issue, said negroes to revert back to me, (the donor,) or my lawful heirs— hereby conveying the legal interest to the trustees aforesaid, in trust, and the possessory interest to the said Eleanor and the heirs of her body forever, (if any,) if none according to the terms before set forth." This deed bears date the 29th of August, 1843, and by an indorsement thereon, appears to have been acknowledged by the donor on the day of its date, and filed for registration on the 4th of September of the same year.

The Court refused to allow the deed to be read as a recorded instrument, but permitted it to go in evidence upon proof of its execution, although more than twelve months had elapsed from the time it was made. To its admission the plaintiffs objected.

Claimants also proved, that the indebtedness on which the judgment was founded, was contracted in 1839, that the suit was pending about two years, and before the gift, and that the judgment was rendered in April, 1844.

The plaintiffs' counsel prayed the Court to charge the jury, that if they believed that James C. O'Hara had the possession of the slaves at the time of, and previous to the levy, then the deed coupled therewith, vested in him such an interest as was the subject of levy and sale. This instruction was refused, and the Court charged the jury, that although the indebtedness of defendants in

execution occurred before the deed was executed, and the deed was coupled with the possession, it did not vest in J. C. O'Hara such an interest as could be levied on and sold by the plaintiffs. *Further*, they prayed the Court to charge the jury, that if the slaves, about the time of the execution of the deed, went into the possession of James C. O'Hara, and so remained more than twelve months, and the deed was not recorded, it would, as to the previous creditors of James C. O'Hara, be taken to be fraudulent, if it was not on a consideration deemed valuable in law. This instruction was also refused, and the jury were informed, that the deed was not of that class which the law required to be recorded. The several points made by the bill of exceptions are regularly reserved and presented for revision.

F. W. Bowdon, with whom was B. F. Porter for the plaintiffs in error, contended—1. The parol evidence of the donor's intentions, was calculated to mislead the jury, and went to explain or vary the deed, which was in itself unambiguous. [3 Stew. Rep. 201 ; 4 S. & P. Rep, 96 ; 1 Porter's Rep. 359 ; 2 Porter's Rep. 29 ; 5 Porter's Rep. 498.] 2. The deed does not vest in Mrs. O'Hara the separate estate in the slaves, and the instructions asked by the plaintiffs upon this point, should have been given to the jury. [Clancy on Rights, &c. 262-8 ; 2 Porter's Rep. 463 ; 8 Porter's Rep. 73.] It attempts to create an estate tail, consequently is thus far void, and the absolute estate vests in the husband, [Clay's Dig. 157, § 37 ; 2 Porter's Rep. 473.] But if this be not so, then it is insisted that the husband is entitled to the slaves for the life of the wife, although they may pass to their children, &c. after her death. [Dunn, et al. v. The Bank of Mobile, et al. 2 Ala. Rep. 152.]

3. The deed was not regularly registered, and was only admitted upon proof made at the bar, of its execution. It is insisted that the Court erred in instructing the jury, that the statute did not require such a deed to be registered.

COLLIER, C. J.—The declarations of the father of Mrs. O'-Hara, made to his son-in-law when the slaves were delivered to him, that he intended them for the use of his (donor's) daughter, &c. were admissible, for the purpose of showing that they were not given absolutely, as an advancement for her, and did not thus

vest *jure mariti*, so as to become subject to the husband's debts, or render inoperative any settlement of them which the father might make. Certainly it would not be allowable to expound the deed by a reference to the previous declarations of the donor. Where an act is consummated by writing, all oral statements are merged, and cannot be resorted to for the purpose of ascertaining the meaning of the party making it; unless, perhaps, where fraud is alledged, or an application is made to equity to reform it, that the intention of the parties may be truly expressed.

It is not necessary to consider at length, whether it is essential to the operation of the deed, as against the creditors of the husband, that it should have been registered within a definite period, after its execution. The cases of Swift v. Fitzhugh, 9 Porter's Rep. 39 ; Thomas & Howard v. Davis, 6 Ala. Rep. 113, very satisfactorily show, that neither the second section of the statute of frauds, nor the act of 1823, " to prevent fraudulent conveyances," require such a deed to be recorded. It cannot come within the first, because possession accompanied the deed and vested in the donee ; nor within the second, because it is neither a "deed of trust, or other legal incumbrance," in the sense in which these terms are there used.

The important inquiry is, does the deed create a separate estate in the donor's daughter, or in herself and children, if any ? In order to solve this question, it is necessary to make an analysis of the deed. The consideration of the gift is said to be, natural love and affection for the donee, and one dollar paid by the trustees, and the conveyance is made to the claimants, in trust for the benefit of Mrs. O'Hara, and the heirs of her body. It is then provided, that Mrs. O'Hara and her husband are to retain the peaceable possession of the slaves, with their increase during coverture, and during the natural life of the former ; and should she die without issue, then the slaves are to revert to the donor, or his heirs. Thus, (as the deed declares,) conveying the legal interest to the trustees, in trust, and the possessory interest to the daughter and the heirs of her body forever ; if none, then according to the terms already stated. The first question which naturally presents itself, is, does a conveyance to trustees, for the benefit of a married woman, and the heirs of her body, confer upon her an estate entirely separate and distinct from her husband.

An agreement by a husband, that "his wife shall enjoy and re-

ceive rents and profits," it has been held, gives her a separate estate. [Clancey on Rights, 263.] So also, a bequest to a married woman, " for her own use, and at her own disposal;" for the necessary effect of the words "at her own disposal," in connection with those preceding them, was to give the legacy to the separate use of the wife. [Id. 263-8-9.] But it has been decided, that a legacy to a *feme covert*, to " her own use and benefit," was not to her separate use. [Id. 267-8.] And vesting property in trustees for a married woman, is not alone sufficient to exclude the marital rights of the husband, and to vest in the wife an exclusive property. [Id. 267; Lamb v. Wragg and Stewart, 8 Porter's Rep. 73.]

In.Jamison's Ex'r v. Brady and wife, 6 Serg. & R. Rep. 466, it was adjudged that a bequest to a married woman "for her own use," conveyed an interest *for her own separate use.* But this conclusion was attained not alone from the import of the words used, but from what was supposed to be the intention of the testator, as gathered from the will, and inferred from extrinsic circumstances. The indebtedness of the husband to the testator was remarked upon as indicating the testator's intention to vest a separate estate in the wife; otherwise his bounty would be of no avail, but operate rather as a release of the husband. But where the father gave personal property to a trustee, in trust for a married daughter, " for and during the term of her natural life," and after her death to such child or children of her's as might then be living, it was held, that the property was subject to the husband's debts, at least during the wife's life. [Lamb v. Wragg and Stewart, *supra*.]

In Crawford v. Shaver, 2 Iredell's Rep. 238, the testator bequeathed all his estate, both real and personal, to his daughter C. and son T,, to have and possess during their lives, and after their death to descend to their children. If T. died without issue, the property devised and bequeathed to him, was to vest in the children of C. It was directed that the slaves given to C. and T. were to be hired out, in, &c. and the profits equally divided between them during life ; that the dwelling house of the testator and tract of land on which he lived, should not be rented out, but other lands were to be rented out as they might deem fit. At the date of the will and testator's death, C. was a married woman. It was held, that the wife, under the expressions of the

will, did not take an estate to her separate use ; the Court remarking, that a construction will not be forced to raise a trust for that purpose, nor will they gather the intention that a separate estate is limited to her, from terms that are ambiguous or equivocal.

It is said, that a trust to the separate use of a married woman should be very distinctly expressed ; that as such claim is against common right, the instrument under which it is made, must clearly speak the donor's intention to bar the husband, else it cannot be allowed. [Clancey on Rights, 262-7 ; Lamb v. Wragg and Stewart, *supra ;* Hawkins, et al. v. Coalter, et al. 2 Porter's Rep. 463 ; Dunn v. The Bank of Mobile, 2 Ala. Rep. 152 ; Inge, et al. v. Forrester, 6 Ala. Rep. 418.] And in Thompson, et al. v. McKissick, 3 Hump. Rep. 631, the Court held, that the intention to create a separate estate must appear plainly, by the use of words that denote an exclusion of the husband, or a declaration as to the enjoyment of the property, incompatible with his dominion over it. [See Hunt, et al. v. Booth, et al. Freeman's Rep. 215.]

So where S., by deed of gift, conveyed to F. certain slaves in these words, "in trust for the use and benefit of my daughter, Ann, and her lawful heirs ;" " in trust for the proper use and benefit of said Ann, and her heirs forever," it was determined that the daughter took an estate, for her sole and separate use, and that during her life it was not subject to the debts of the husband. [1 Smede & M. Ch. Rep. 647.] But in a conveyance to a married woman, the words "in her own right," would not, by the common law, invest her with a separate estate in the property. [The G. G. Bank v. Barnes, et al. 2 Smede & Rep. 165.]

From this view of the law, it sufficiently appears, that a gift to trustees for the *benefit of* a married woman, and her heirs, does not impart an interest to her beyond the control and dominion of her husband. There is no peculiar potency in the word " benefit," which the terms " in trust for," and " for the use of," do not possess. Every gift, either to a third person directly, or in trust for him, is for his *benefit,* whether or not it is so declared *in totidem verbis;* and the word, so far as the legal effect of the instrument is concerned, is a mere expletive, neither limiting or enlarging the estate of the beneficiary. If, however, the isolated expression were of equivocal import, as it respects the donor's

intention, the declaration that the husband and wife should re-tain the possession of the slaves during coverture, and the life of the latter, very satisfactorily shows, that it was not intended to exclude the husband from the enjoyment of the property during the life of the wife, or so long as he might live with her. The subsequent provision, that in the event of Mrs. O'Hara's death without issue, the slaves should revert to the donor or his heirs, and declaring that the legal interest was conveyed to the trustees, in trust, and "the possessory interest" to her and her heirs, can-not impair the rights of the husband beyond the limitation pre-scribed in the preceding part of the deed. The property was only to revert, upon a contingency which could not be manifest-ed until the wife's death. Perhaps it is not necessary to inquire, whether the right, or the enjoyment thereof, vested in Mrs. O'-Hara's children, during her life, or whether the term "heirs" is to receive a technical meaning, and their right under the deed, vest upon her death. In either event, the husband, under the terms of the deed, would be entitled to the possession of his wife's inter-est; and this right, coupled with the actual possession, is the sub-ject of levy and sale under the execution against the husband alone. [Dunn and wife, et al. v. The Bank of Mobile, et al. su-pra.] The fact that the slaves are conveyed to a trustee, for the benefit of the wife, if they come to the possession of the hus-band, and she has no separate estate, they may be sold for his debts, without a decree in equity. [Inge, et al. v. Forrester, su-pra; Carlton & Co. v. Banks, 7 Ala. Rep.] We may, however, remark, that considering the deed in all its parts, we cannot doubt that it confers upon the husband and wife the right of possession, during the coverture, and during the life of the wife. Upon the death of Mrs. O'Hara, the husband's right of possession ceases; and after that event, the possessory right of the heirs (as it is call-ed,) commences. From this view of the deed it results, that as the husband was in possession of the slaves, they were subject to seizure and sale for the satisfaction of the execution.

The conclusion attained, renders it unnecessary to consider, whether the donor was a competent witness for the claimants; but we cannot very well conceive what interest he had in the re-sult of the suit. True, (as it was natural,) the presumption is, that his feelings were concerned for the success of the trustees, they being the representatives of his daughter's interest. But

the mere matter of feeling does not affect the competency, but the credibility of a witness only.

Where the written agreement contains more or less than the parties intended, or is variant from the intent of the parties, by expressing something substantially different, if the mistake is made out by satisfactory proof, *equity* will reform the contract, so as to make it conformable to the precise intent of the parties. But such proof is not admissible at law, at least under the circumstances of the case before us. [Paysant v. Ware & Barringer, et al. 1 Ala. Rep. 170-1.] Whether such proof can be made as will show a mistake, and authorize a Court of Chancery so to modify the settlement as to secure to Mrs. O'Hara a separate estate in the slaves, is a question not now presented, but proper for the consideration of the parties interested; and whether her children, or those who may be entitled after her death, can protect their future interest, is alike foreign to our inquiries at present.

The consequence is, that the judgment of the Circuit Court is erroneous—it is therefore reversed and the cause remanded.