## BALTZER & Another v. RALEIGH & AUGUSTA RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NORTH CAROLINA.

Argued November 18, 1885.—Decided December 7, 1885.

To entitle a plaintiff to relief in equity on the ground of mistake or fraud, the mistake or fraud must be clearly established.

On the voluminous facts in this case the court is of opinion that the plaintiffs have not established any mistake or fraud which entitles them to the relief for which they pray.

The facts which make the case are stated in the opinion of the court.

*Mr. Attorney-General* and *Mr. John N. Staples* for appellants.

*Mr. Edmund Randolph Robinson* [*Mr. Thomas C. Fuller* was with him on the brief] for appellees.

Mr. Justice Woods delivered the opinion of the court.

This bill was filed October 18, 1878, by Herman R. Baltzer and William G. Taaks, the appellants, against the Raleigh and Augusta Air Line Railroad Company, a corporation of the State of North Carolina, and others, for a decree against the railroad company for $93,615.62, with interest thereon from November 2, 1868, that sum being the balance due them, as the plaintiffs alleged, for iron furnished the Chatham Railroad

Company, whose name, on December 1, 1871, was changed by an act of the legislature of North Carolina to the name under which the company is sued in this case. The Chatham Railroad Company was authorized to build a railroad from Raleigh to the South Carolina State line. To help the company to construct its road, the State of North Carolina, by an ordinance of its convention passed on March 11, 1868, authorized its public treasurer to issue to the company bonds of the State for $1,200,000, and by an act of its general assembly, passed August 15th of the same year, authorized the same officer to issue to the company other bonds of the State for the additional sum of $2,000,000. The bonds of both issues were for $1000 each, were payable in thirty years, and were secured by a like amount of bonds of the company deposited with the public treasurer, and were also secured by statutory liens and by mortgages on the franchises and property of the company.

On September 1, 1868, the company had received the $1,200,000 authorized by the convention, and on October 19, 1868, the company having complied with the conditions prescribed by the act of the general assembly, the $2,000,000 in bonds of the State authorized by the general assembly were delivered to it.

On September 1, 1868, the defendant, John F. Pickrell, who was a resident of the city of New York, doing business in Wall Street as a banker and broker, and being in good credit, made an offer in writing in which he represented himself and John D. Whitford, of North Carolina, to W. J. Hawkins, the president of the Chatham Railroad Company, to do the entire work on the Chatham Railroad, such as grading, superstructure, and masonry, and furnish all material for the same, including the iron rails, and to take the State bonds in payment. This proposition was accepted by resolution adopted by the board of directors of the railroad company on September 4, 1868. The firm of Greenleaf, Norris & Co. and Charles Gould, of New York, were interested with Pickrell and Whitford in the performance and profits of the contract.

Having thus bound themselves to build the railroad and furnish the iron, Pickrell and Whitford began negotiations for

the purchase of the iron with Schepeler & Co., a firm engaged in the iron. trade in New York. This latter firm asked Baltzer & Taaks, the plaintiffs, to join them in a contract to sell the iron, which they agreed to do.

The parties, Pickrell and Whitford on one side, and Schepeler & Co. and Baltzer & Taaks on the other, met at the office of the counsel of Baltzer & Taaks, in New York, and, in the presence of and with the concurrence of the counsel, a draft of the intended contract for the purchase and sale of the iron was made. In the draft the names of Pickrell and Whitford both appeared as parties of the second part. This paper was taken by Pickrell and Whitford, who said, so the plaintiffs alleged, that they must send it to W. J. Hawkins, president of the Chatham Railroad Company. Afterwards the paper was returned to Baltzer & Taaks, with various changes, among which was the dropping of the name of Whitford, because he declined to sign the contract as a party. From this paper the final agreement between the parties, dated September 11, 1868, was drawn up by the counsel of Baltzer & Taaks, and was dated and executed September 11, 1868.

The introduction to this contract was as follows:

"This agreement, made this eleventh day of September, one thousand eight hundred and sixty-eight, by and between Messieurs Schepeler & Company and Messieurs Baltzer & Taaks, of the city of New York, parties of the first part, and John F. Pickrell, also of the city of New York, party of the second part, witnesseth."

By it the parties of the first part agreed to sell and deliver to the party of the second part, and the party of the second part agreed to purchase and receive of the parties of the first part, 10,000 tons of English or Welsh iron rails, at the price of $79.36 per ton. The contract then proceeded thus:

"The iron is to be paid for as follows: The party of the second part is to deposit with the Continental National Bank, on or before the execution of this agreement, such an amount of the bonds of the State of North Carolina as will, at the market price on the day of deposit, be equal to the whole purchase-money for the said ten thousand tons of iron, and fifteen

per cent. in addition thereto, which margin of fifteen per cent. is to be kept good until the full performance of this contract. The said bonds are to be held by said bank, subject to the joint order of the parties of the first and second parts and William J. Hawkins, or his attorney, or the survivors of said parties respectively. On the presentation of a warehouse receipt or ship's delivery order for any lot of said iron, the party of the second part and said William J. Hawkins, or the survivor of them, are to join with the parties of the first part in drawing an order on said bank, in favor of the parties of the first part, for so many of the said bonds as will, at the market price thereof on the day of drawing, equal the sum payable for such lot of iron at the price of seventy-nine dollars and thirty-six cents per ton as aforesaid, or pay that amount in money.

"Upon presentation of a bill of lading for any lot of such iron placed on shipboard for transportation to the port of New York or Norfolk, Virginia, the party of the second part and the said Hawkins, or the survivor of them, shall join with the parties of the first part in drawing an order on the said bank, in favor of the said parties of the first part, for so many of said bonds as will, at the market price thereof on the day of drawing, equal the sum due for the iron mentioned in the bill of lading, at forty-nine dollars and forty-six cents per ton ; the balance payable for such iron, namely, twenty-nine dollars and ninety cents per ton, shall be paid in like manner on the arrival of the vessel containing the same at the port of New York or the port of Norfolk. Notice shall be given to the party of the second part, or his personal representatives, of the arrival of any ship containing iron, and he or they are to be ready to receive the same whenever ship is ready to discharge."

The contract further provided that "in the event of the death of said party of the second part and no appointment of a personal representative at the time notice is required to be given," notice might be given to Hawkins, and "if at any time the party of the second part, or his personal representative," or the said Hawkins or his attorney, or the survivor of them, should refuse to join in drawing an order for the amount due for iron, the parties of the first part might retain the ware-

house receipt and sell the iron for which payment had been refused "for and on account of the party of the second part, or his personal representatives," who should be liable to reimburse the parties of the first part any loss from such resale, and notice of intention to sell should be given " by depositing the same in the general post office, in the city of New York, addressed to the party of the second part, or his personal representatives, or the said William J. Hawkins, in the event of the death of the said party of the second part, and the non-appointment of any personal representative, in the city of New York."

The contract also contained the following stipulation :

"It is understood that the said bonds are deposited as a fund out of which to pay for said iron, and that the parties of the first part are to have a lien on the same, for the faithful performance of this contract, on the part of the party of the second part, but it is also understood that the parties of the first part do not look solely to the said bonds for payment, and if for any reason they should at any time fail to constitute a fund for payment, the parties of the first part are nevertheless to be paid for iron at the same rates and times as hereinbefore provided.

" The party of the second part reserves the right to sell any or all of the bonds deposited with said bank, and, in case of sale, the money realized for the same, or a sufficient amount to cover the price of all said iron, and fifteen per cent. in addition thereto, shall be placed with said bank on the same terms, and represent the said bonds for all the purposes of this contract.

" The said bank shall deliver the bonds sold on the presentation and delivery of such joint order as aforesaid. The parties of the first part shall have their election to draw, in payment for iron, bonds, or money, the proceeds of bonds, if any shall have been substituted in the place of bonds sold."

The contract concluded, and was signed and witnessed, as follows :

"In testimony whereof the said parties to these presents

have hereunto subscribed their names the day and year first hereinbefore written.

> SCHEPELER & CO.,
>   By John T. Schepeler.
> BALTZER & TAAKS,
>   By H. R. Baltzer.
> JOHN F. PICKRELL.

" In presence of George H. Sturr."

The contract was, after its execution, acknowledged in the city of New York, on September 24, 1868, by the parties who signed it, before George H. Sturr, a notary public of New York County.

Afterwards, but not on the same day, W. J. Hawkins executed a paper bearing the same date as the contract above mentioned, which opened with the following recital: " Whereas Messrs. Schepeler & Co. and Baltzer & Taaks and John F. Pickrell have entered into an agreement of even date herewith, by which means the said Schepeler & Co. and Baltzer & Taaks agree to sell and deliver, on certain terms therein mentioned, ten thousand tons of iron rails to the said John F. Pickrell."

By this second contract Hawkins stipulated as follows: "That fourteen hundred bonds of the State of North Carolina, each for $1000, numbered from 1600 to 3000, inclusive, which are now on deposit in the Continental Bank of the city of New York, subject to my order as president of the Chatham Railroad Company of North Carolina, shall remain on deposit in said bank, subject to the joint order of the parties mentioned in the said contract, as therein provided, while said contract is being performed, for the purpose of providing for the payment of said iron, and as security for the performance of said contract as therein provided; and I agree to unite in drawing the orders therein provided for at the times and in the manner therein set forth; provided, however, that it is hereby distinctly understood and agreed that whenever any delivery of said bonds is to be made, and any order for such delivery is required pursuant to said contract, I am to have the option and right to pay in money the sum payable under said contract for

the iron, in respect to which such delivery of bonds is required, at the contract price; . . . and upon such money payments being made by me, I shall have the right to withdraw from deposit the bonds which otherwise would have been delivered under said contract, and such bonds shall be delivered to me by said Continental National Bank on the presentation of such joint order as aforesaid, such option and right to be exercised by me within five days after being notified in the manner provided in the contract of the right of said parties of the first part therein named to a delivery of bonds pursuant thereto.

"It is also hereby expressly provided that in case of loss of the iron or any part thereof, on shipboard between the port of shipment and the port of entry or delivery, all payments made on account thereof are to be refunded by said Schepeler & Co. and Baltzer & Taaks as soon as such loss is ascertained."

This contract was signed "W. J. Hawkins, President Chatham Railroad Company."

These two contracts were designated in the record respectively as "A" and "B."

On October 12, 1868, there were delivered to John F. Pickrell, by Schepeler & Co. and Baltzer & Taaks, under this contract with him, 630 tons of iron rails, and on November 2 following, in three lots, 2104 tons. The 630 tons delivered October 12, 1868, were paid for before any North Carolina bonds were issued or received in New York, by the check of Greenleaf, Norris & Co. for $63,593.46. This more than paid for the iron, and left a balance due Pickrell of $11,794.27, which was settled with him afterwards. The three deliveries made on November 2, the price of which was $167,098.73, were paid for in part by the check of Greenleaf, Norris & Co. for $75,000, which was cashed, leaving a balance of $92,098.73. For this balance Baltzer & Taaks received from Pickrell, between November 2 and November 20, one hundred and fifty North Carolina State bonds of $1000 each.

The validity of the bonds of the State of North Carolina, issued by authority of the ordinance of the Convention of March 11, 1868, and the act of the general assembly of August 15, 1868, having been questioned in the latter part of the year

1868, they became discredited, and both the railroad company and Pickrell were embarrassed thereby. The contract between Pickrell and the railroad company was changed, and the length of the road to be built by Pickrell was, by contract dated March 6, 1869, reduced. Under the contract as amended he built the railroad from Raleigh to Haw River, a distance of thirty miles, furnishing therefor the iron rails. The company paid him in full for the rails and for constructing the road.

In consequence of the embarrassment resulting to Pickrell from the discrediting of the North Carolina bonds, no iron was received by him after November 2, 1868, from Baltzer & Taaks on the contract of September 11, 1868; and on August 11, 1869, Baltzer & Taaks, by a letter of that date addressed to Pickrell, released him, as far as they were concerned, "from obligations of receiving any more iron under contract dated 11th September, 1868, and," they added, "we consider the same as closed." The balance sued for was, therefore, for iron delivered on November 2, 1868.

The bill in this case was based on the assumption and averment that the Chatham Railroad Company was a party to the contract of September 11, 1868, designated " A," and that all the stipulations therein made by Pickrell were made by him for the railroad company, acting by its authority and in its behalf, and that the Chatham Railroad Company was the party of the second part to the contract, and not Pickrell; that the contract was to be construed together with and as a part of the agreement of the same date, signed by W. J. Hawkins, President Chatham Railroad Company, and designated " B ; " and that, under the terms of these contracts, the railroad company had purchased, and received, and used 2734 tons of iron rails, on which there remained unpaid and due to the plaintiffs the sum of $93,615.57, with interest from November 2, 1868.

The bill prayed that the contract " A " might be reformed and corrected by the substitution of the name of the Raleigh and Augusta Air Line Railroad Company, formerly called the Chatham Railroad Company, for the name of John F. Pick-rell, who, it was alleged, as the agent of said company, nomi-

nally signed such agreement, at its procurement and request, and for its benefit and advantage, and that said agreement, when so reformed, might be enforced as the agreement and undertaking of the railroad company, the same as if its name had been signed thereto and its corporate seal affixed.

The bill further prayed for a decree against the Raleigh and Augusta Air Line Railroad Company for the said sum of $93,615.57, and interest thereon from November 2, 1868, with the right to enforce a first lien therefor on all the franchises, estate, and property of the railroad company. The answers of the defendants, under oath, were called for.

The railroad company answered under its corporate seal, and Hawkins and Whitford under oath. Pickrell failed to answer, and a decree *pro confesso* was taken against him. The railroad company averred in its answer that it was not a party to the contract of September 11, 1868, designated " A ; " that Pickrell was not its agent and had no power or authority to enter into said contract, or any other contract for it; that the contract " B " was signed by the defendant Hawkins to enable Pickrell to carry out the contract " A," which he had previously made with the plaintiffs, by which he expected to procure the iron for the defendant company's road, and with no purpose to become a party to the contract " A " or to bind the railroad company thereby.

The answer of the railroad company further averred that Pickrell had paid the plaintiffs for all iron delivered by them under their contract " A," and that the company had paid Pickrell for all work done and materials furnished by him, including iron, under his construction contract with the company, and pleaded the North Carolina statute of limitation of three years in bar of the plaintiffs' suit.

Whitford answered that when the contract " A " was made and executed he was not the agent of the defendant company to make or execute the same, or for any purpose, and did not represent himself to be so to the plaintiff; and that he was not a party to said contract or interested therein.

Hawkins in his answer denied that Pickrell was the agent of the defendant company, or that he had any authority to

make any contract in behalf of the company for the purchase of iron, and averred that Pickrell made the contract for himself to procure iron to perform his own contract with the railroad company. He denied that the contract "B," signed by himself as president of the Chatham Railroad Company, was a part of the contract "A," but averred that it was a separate and independent contract, made by him to enable Pickrell to pay for the iron which he had purchased from Baltzer & Taaks and Schepeler & Co., and that the two contracts were not, at the time of their execution, regarded by any of the parties thereto as forming parts of the same contract, but as distinct, each binding upon the party or parties signing the same, and upon him or them alone, and that he had fully performed every part of the agreement "B" signed by him.

To these answers replications were filed by the plaintiffs. Upon final hearing the Circuit Court dismissed the bill, and the plaintiffs appealed.

It is plain that the relief prayed for by plaintiffs in their bill of complaint cannot be granted unless they establish the fact that the Chatham Railroad Company contracted with them for the purchase of iron rails, and that the rails were delivered by them to the railroad company and have not been paid for.

The agreements set out in the record do not show upon their face any contract by which the railroad company agreed to purchase iron rails of the plaintiffs. The plaintiffs, however, insist that taking contracts "A" and "B" together and construing them as one contract, an agreement of the railroad company to buy ten thousand tons of iron from the plaintiffs can be made out. We think otherwise. If both contracts had been written on the same sheet of paper and executed at the same time, that fact would not have changed the obligations which the parties assumed. Reading both contracts, it appears that the plaintiffs, the parties of the first part, sold and agreed to deliver to Pickrell ten thousand tons of iron rails. Pickrell agreed to receive the rails and pay for them at a certain price in bonds of the State of North Carolina, and Hawkins, as agent of the Chatham Railroad Company, agreed to join with the

other parties in an order for the withdrawal of the bonds from their place of deposit, to be handed over to Pickrell,· and by him handed over to the plaintiffs.   In this manner the debt of the company to Pickrell, and the debt of Pickrell to the plaintiffs for the iron, would be paid.   There is nothing in either of the two contracts, considered separately or as one, which discloses any contract between the plaintiffs and the railroad company for the sale and purchase of iron.   On the contrary, contract " A " is a contract for the sale and purchase of iron, to which the plaintiffs and Schepeler & Co., on one part, and Pickrell, on the other, were the only parties, and Exhibit " B " opens with a recital of the fact that, by contract " A," the plaintiffs and Schepeler & Co. had agreed to sell and deliver to Pickrell ten thousand tons of iron rails.   The railroad company was not mentioned in contract " A," and all that it agreed to do by contract " B " was to unite in an order for the bonds. But the plaintiffs contend that the two contracts are to be so read that Pickrell, who, according to contract " A," agreed to buy and pay for ten thousand tons of iron, is not to buy the iron or pay for it, or do anything which the contract· requires him to do, but that the railroad company, which is not named as a party to it at all, is to do everything which the contract requires of Pickrell.

On the theory that the two contracts were one contract, to which the railroad company and not Pickrell was a party, the inquiry is pertinent, what was the necessity of its execution by Pickrell at all, when it was signed by Hawkins, the president of the company, and why should the railroad company, having two agents fully authorized to make the entire contract, execute one part of it by one agent, and the other part by the other ?

In the light of the surrounding circumstances, the meaning of the two contracts is plain and is not open to construction, especially to a construction which relieves one party of all the obligations assumed by him and puts them upon another, who had not assumed them at all.   Pickrell having made a contract with the railroad company to construct its road and furnish the iron therefor, and to take his pay in North Carolina State

bonds, makes another with the plaintiffs for the iron and agrees to pay for it with the same class of bonds which he was to receive from the railroad company. Now, in order to secure to the plaintiffs their pay for the iron sold, and to Pickrell pay for his work done and materials furnished, and to protect the railroad company from a misappropriation of its State bonds, the contract " A " provided that, upon presentation of a warehouse receipt or ship's delivery order for any lot of iron, all three parties, the plaintiffs, Pickrell, and Hawkins, the president of the railroad company, should join in an order for the withdrawal from the bank of so many bonds as would pay for such lot of iron. It was because the railroad company was not a party to contract " A " that the contract " B " was executed by Hawkins, its president, whereby he agreed to join in an order for the withdrawal of bonds when the plaintiffs were entitled to them by the terms of their contract " A " with Pickrell. It is plain, therefore, that, as they stand, the contracts mean, what their language imports, that Pickrell contracted with the plaintiffs for the purchase of the iron, and the railroad company did not.

But the plaintiffs contend that contract " A " should be reformed by substituting therein the name of the defendant railroad company the real party of the second part, for the name of John F. Pickrell, and, being thus reformed, that they are entitled to the further relief prayed in their bill.

To entitle the plaintiffs to this relief, they must show that the name of Pickrell, as the party of the second part, was inserted, and the name of the railroad company left out of the contract, by mistake or fraud. In such a case, it is well settled that equity would reform the contract, and enforce it, as reformed, if the mistake or fraud were shown. *Bradford* v. *The Union Bank*, 13 How. 57, 66; *O'Neil* v. *Teague*, 8 Ala. 345. But the mistake must be clearly shown. If the proofs are doubtful and unsatisfactory, and if the mistake is not made entirely plain, equity will withhold relief. *Shelburne* v. *Inchiquin*, 1 Bro. Ch. 338; *Henkle* v. *Royal Assurance Co.*, 1 Ves. Sen. 317; *Gillespie* v. *Moon*, 2 Johns. Ch. 585; *Lyman* v. *United Ins. Co.*, 2 Johns. Ch. 630; *Clopton* v. *Martin*, 11 Ala. 187; *Stockbridge*

*Iron Co.* v. *Hudson Iron Co.*, 107 Mass. 290. Even without the application of this strict rule the case of the plaintiff fails.

In the first place, there is no averment in the bill that the name of Pickrell was inserted in the contract by mistake or fraud for that of the railroad company, and, as far as the record shows, the plaintiffs never asserted in any way that such was the case until after the bringing of this suit, more than ten years subsequently to the execution of the contract. The facts already stated and not disputed show that there was no fraud or mistake in drafting the contract. Both the original draft and the final contract were drawn under the supervision of counsel for the plaintiffs, and the latter was signed by the parties on September 11, 1868, and nearly two weeks later was acknowledged by them before a notary public. The record shows that the plaintiffs, so far as the contract was carried out, performed it precisely as its terms required. The iron delivered was delivered to Pickrell, the payments made were made by Pickrell and receipted for to him, the accounts in reference to the business were kept in his name on the books of the plaintiffs, an over-payment made on the iron delivered was returned to him, and a final settlement and adjustment of the business, and a statement of the account of the plaintiffs with him arising out of the contract, was made nearly a year after the last delivery of iron.

It is necessary, in order to sustain their contention that the name of Pickrell was inserted in the contract when that of the railroad company should have been, for the plaintiffs to show that Pickrell was the agent of the railroad company, authorized by it to make the contract, and that he used his own name in the contract instead of the name of his principal. There is no proof in the record to show that the defendant company ever authorized Pickrell to act as its agent in any matter whatever; on the contrary, it is established beyond question that Pickrell was not the agent of the railroad company. The company denies it in its answer; Hawkins, the president of the company, denies it; Whitford, the associate of Pickrell, denies it; and Pickrell himself does not assert the contrary, and he swears he did not, in purchasing the iron of the plaintiffs, rep-

resent himself or Whitford to be the agent of the railroad company. There is no proof in the record which tends to rebut this evidence; on the contrary, all the dealings of the plaintiffs with Pickrell, the letters, accounts, payments, and settlements relating to the contract " A," show that Pickrell was acting for himself, and the plaintiffs so understood it, and that the contract was what it purports on its face and in all its provisions to be, namely, the contract of Pickrell, and not of the railroad company.

If John F. Pickrell, party of the second part in contract " A," means the Chatham Railroad Company, then the execution of contract " B " was a vain and futile act. It is only on the theory that Pickrell, and not the railroad company, was the party of the second part in contract " A " that the necessity for contract " B " becomes apparent. For the railroad company having, according to the contention of plaintiffs, consented to the method for the withdrawal of the bonds provided in contract " A," it was bound and protected thereby, and there was no necessity for the preparation and execution of another contract, whereby the railroad company bound itself to substantially the same thing.

It is also apparent upon the most cursory reading of contract " A," that the substitution of the name of the railroad company for that of Pickrell would render several of its provisions nugatory and impossible of execution, and the paper generally incongruous and absurd.

But if anything further were needed to show how baseless is the contention of the plaintiffs, that the name of Pickrell was inserted in the contract " A " in place of that of the railroad company by mistake or fraud, it is found in the deposition of Baltzer, one of the plaintiffs, who testifies that contract " A " was prepared by the counsel of the plaintiffs, and that the contracts " A " and " B " express in exact words the final agreement of the parties with reference to the matters embraced therein.

As, therefore, the contract expressed the agreement of the parties, no court has power to change it. Courts of equity may compel parties to execute their agreements, but have no

power to make agreements for them. *Hunt* v. *Rousmaniere*, 1 Pet. 1.

The evidence which was offered of the understanding between Baltzer and Pickrell that the covenants of Pickrell were the covenants of the railroad company was inadmissible, first, because it is a general rule that when a contract has been reduced to the form of a document or series of documents, no evidence can be given of the terms of such contract, except the document itself; and, second, the railroad company could not be bound by the understanding of other persons to which it was not a party. The only covenant of the railroad company appearing upon the face of the papers was that contained in contract " B," and that covenant Baltzer, one of the plaintiffs, and Hawkins, who signed it as president of the railroad company, both testified had been fully performed.

The plaintiffs, therefore, fail in the first step necessary to entitle them to the relief prayed by their bill; they show no contract between themselves and the railroad company.

But their case must fail for another reason. The evidence in the record shows conclusively that the plaintiffs were paid by Pickrell, in accordance with the terms of their contract with him, for all the iron bought by Pickrell and used by him in the construction of the road of the defendant company.

It is not disputed that for the balance now sued for Baltzer & Taaks received from Pickrell, between November 2 and November 20, 1868, one hundred and fifty North Carolina bonds of $1,000 each. On November 20, they reported in writing to Pickrell that they had sold one hundred of the bonds at 64 cents on the dollar, amounting to $62,493.40, and on November 21, that they had sold the remaining fifty bonds for $63\frac{1}{2}$ cents on the dollar, amounting to $30,996.82, " producing to " his " credit " $93,490.22. The proceeds of the bonds, with the over-payment made by Pickrell on the first lot of iron delivered, more than paid the amount due on the lots delivered November 2, 1868. On November 23, 1868, Baltzer & Taaks stated their account with Pickrell, which showed there was due to him on account of over-payment for the iron delivered $937.44, and this sum they paid him on December 28, 1868.

By a final balance-sheet, made out by themselves in September, 1869, more than ten months after the bonds were received by them, and nine months after the North Carolina bonds had, according to the averments of their bill, become discredited and of little value, they credited Pickrell with the amounts for which, on November 20 and 21, 1868, they reported that the bonds had been sold by them, and such balance-sheet showed that they had been paid in full for all the iron furnished by them.   There is no averment in the bill that the plaintiffs did not sell the one hundred and fifty bonds as they reported to Pickrell they had done, or that they still have them in their possession, and there is no offer to return them either to Pickrell or the railroad company.   These facts, considered in connection with the further fact that the contract for the sale of the iron provided that payment therefor should be made in North Carolina State bonds, leave no ground for the contention that there is anything due the plaintiffs from any one for the iron furnished under contract " A."

Therefore, without considering the fact that the plaintiffs have never, either in their bill or at any time, tendered back the one hundred and fifty bonds of the State of North Carolina, which they admit they received on account of the iron furnished, or the fact that Schepeler & Company, who were parties to the contract on which the suit is based, are not made parties plaintiff, and without considering the statute of limitations of North Carolina, which is pleaded by the railroad company, we are of opinion that the plaintiffs have failed to maintain their suit, and their bill was properly dismissed.

*Decree affirmed.*