BALDWIN v. NATIONAL HEDGE & WIRE-FENCE CO.

(Circuit Court of Appeals, Third Circuit. February 28, 1896.)

1. REFORMATION OF DEEDS—MISTAKE—CHARACTER OF PROOFS.

Mistake, though arising from the carelessness of the parties themselves, and not of a scrivener, in drawing and signing the deed, may be proved for the purposes of a reformation. If the proofs of mistake are entirely plain, and satisfactory to the court, the relief will be granted, though the mistake is denied and there is a conflict of testimony.

2. SAME—INADEQUACY OF PRICE.

Inadequacy of price, while not of itself sufficient ground for reformation, as between parties standing on an equality, is yet a material fact, which, in connection with other facts, may amount to proof of fraud or mistake such as will warrant a reformation.

3. COMPETENCY OF WITNESSES—ATTORNEY AND CLIENT.

There is no rule of law that will prevent counsel from giving testimony in behalf of their client, and in corroboration of his statements, as to admissions made prior to the suit, and in the course of an interview sought by the client for the purpose of ascertaining defendant's view of the transaction giving rise to the suit.

4. REFORMATION OF DEEDS—ASSIGNMENT OF PATENT.

An unconditional assignment of an entire patent *held* to have been intended only as a license for a single county, and reformation granted accordingly, where, in the opinion of the majority of the court, not only the parol evidence, but every incident and circumstance attending the sale, both before and after execution of the deed, showed that the parties negotiated for the sale of the county alone, and there was no evidence outside of the deed of any other agreement or understanding. 67 Fed. 853, reversed. Butler, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

This was a suit in equity by William Baldwin against the National Hedge & Wire-Fence Company for the reformation of a deed purporting to assign all of complainant's rights in a patent for an invention. The circuit court dismissed the bill after final hearing on the merits (67 Fed. 853), and complainant has appealed.

F. Carroll Brewster, for appellant.

John G. Johnson, for appellee.

Before ACHESON, Circuit Judge, and BUTLER and WALES, District Judges.

WALES, District Judge. This was a suit to reform a deed, for the purpose of correcting an alleged mistake, and to make the instrument conform with the intended agreement of the parties before and at the time of its execution. The deed is in these words:

"Plashed Fences, William Baldwin.

"York, Penna., March 4th, 1889.

"Know all men by these presents, that I, William Baldwin, of Marion, Indiana, for one dollar to me in hand paid, and other valuable considerations, the receipt whereof is hereby acknowledged, I do hereby assign, transfer, and set over all my title and interest in patent No. 274,895, date April 3, 1888,—being the sole owner and patentee,—to the National Hedge and Wire-Fence Company, of York, Penna. William Baldwin. [Seal.]

"Witness:
"E. H. Neiman.
"S. B. Gleason.
"J. Jessup."

The material averments of the bill are that prior to the 4th of March, 1889, the complainant was the inventor and patentee of a useful and novel invention, for which letters patent No. 274,895, dated April 3, 1888, had been issued to him, and that he was the sole owner thereof; that said patent was for an improvement on two former patents for his inventions, dated, respectively, February 28, 1882, and August 22, 1882, and numbered 254,187 and 263,094, all of which patents related to the plashing down of hedge fences; that the defendant desired to purchase the right of said patent No. 274,895 for the territory of Baltimore county, Md., and so informed the complainant; thereupon negotiations were opened concerning the purchase by the defendant of the right to the said patent, and that the negotiations between the complainant and defendant related wholly and exclusively to the right for the territory aforesaid; that at the time the deed was signed by the complainant the value of his right and interest in the patent was more than $50,000, and that the defendant was well

acquainted with the utility and value of the complainant's invention; "that it was by the mutual mistake of the parties that said instrument was so written as to assign and transfer all the right of the orator under his patent, and he did not at any time intend to make such a transfer or assignment, and the defendant did not intend that such assignment or transfer should be made, but both parties then and there meant and intended that only a right in said county of Baltimore should be assigned or transferred;" "that the defendant has had continuous possession of the deed since the date of its execution; and that the complainant was wholly ignorant that the defendant claimed any right to the patent, except the right for Baltimore county, until the 2d day of November, 1893." The present suit was begun December 8, 1893. The answer admits the prior ownership of the patent by the complainant, but avers "that said assignment was properly and correctly prepared and executed in pursuance of the agreement, and that the same in no way was executed by mistake." The bill was dismissed by the circuit court, and the complainant has taken this appeal. The ground for dismissal of the bill appears from the following specification of error: "The learned court erred in finding that the proof of mistake was not clear and satisfactory, and that the mistake is not free from doubt and uncertainty."

The question before us is largely, if not wholly, one of fact, namely, are the proofs in the case sufficient to satisfy the conscience of the court that a mutual mistake was committed by the parties to the deed of March 4, 1889, as alleged in the bill? William Baldwin, the complainant, was, at the time of executing the deed, a resident of Marion, Ind., aged about 45 years, and by occupation a farmer and nurseryman. He had been quite extensively engaged in business, and was the owner of the three patents already referred to. The testimony of the complainant is to this effect: As the result of a previous correspondence by letter with Dr. Neiman, who was a director and general manager of the defendant company, the complainant went to York, Pa., on the 3d of March, 1889, for the purpose of negotiating for the sale of one or more of his patents. On Monday, the 4th, he met Dr. Neiman and Mr. Gleason (the latter since dead), who represented the defendant, and was asked what he would sell them Baltimore county for. They said they were expecting to organize a hedge company in Baltimore county, and had been threatened by the Frederick Hedge Company for infringement; that the latter company was using the patent of Wesley Young, who was a rival of the complainant, and had caused the latter some trouble, by unsuccessful suits against him for infringement. And for this reason the complainant was induced to say:

"If it's anything to help defeat Wesley Young, I'll let you have the county very cheap. * * * I'll make you the county for $25. That'll be enough to pay my expenses for the trip from Marion to York and return."

The conversation was had in Dr. Neiman's office. In the evening, Neiman, Gleason, and complainant met at the office of the defendant company, where Mr. Jessup, the secretary of the defendant, joined them. "Jessup asked if we had come to any terms," to which complainant replied that he "had agreed to let them have Baltimore

county for the small sum of $25, to help them out of their trouble that they were expecting. * * * Gleason slipped the deed over to me, and says, "Here's a deed prepared for Baltimore county, Mary-, land.' I picked up a pen, and signed, and slipped it back to him." Jessup handed the complainant $25, and the latter afterwards discovered that his hotel bill had been paid. The complainant neither read the paper which he had signed, nor was it read over to him,— the reason being that he was busy talking with Jessup and Neiman; was giving them the county for a small sum; "thought everything was all right, and had all confidence in the National people." The complainant left York on the morning of the 5th. In April, 1889, complainant received a letter from Dr. Neiman,—which he has been unable to find,—the substance of which was to know for what complainant would sell his patents for several counties in Eastern Pennsylvania, "and if I would take the same per county that I sold them Baltimore county," with the request that he should come to York and consider about the matter. Complainant's answer was that he would not take less than $50 per county, and that he would be in York about the last of May or first of June, about which time he was contemplating a trip abroad. He arrived in York on the 5th or 6th of June, having been detained three or four days on the way by the Johnstown flood, and there met Neiman, Gleason, Krider, and Gallatin. (Gleason was a general manager, Krider was the president, and Gallatin was a salesman, of the company, as appears from other parts of the proofs.) The parties not being able to agree upon terms of sale, it was proposed by Gleason that the complainant should join the National people, put his patents in with theirs, and increase the capital stock,—the complainant to take stock for his patents, and manage the company's business in the West,—but no arrangement was concluded. Complainant returned from abroad on August 28, 1889, and on his way to Marion stopped at York, and had another interview with the persons just named, at which the proposed combination was again discussed, without reaching any definite conclusion. Again, in October or November, 1889, complainant went to York, at the request of Neiman, and again met the same representatives of the defendant as before, who desired to know for what price he would sell his patent rights for the eastern half of Pennsylvania. He asked $4,000. After a brief conference this offer was declined. They said they might buy later on. All of these conversations included patent No. 274,895. "They said that was the patent they wanted, if any." The complainant first discovered or heard of the mistake in the deed on November 3, 1893, through Samuel Brightbill, to whom and John L. Gallatin he had sold and assigned patent No. 274,895, for the state of New York, for the sum of $34,000, in the latter part of 1892. Brightbill came to the complainant's home, and said, "You had no right to sell me the patent which you had already assigned to the National Hedge Company." He demanded a return of his share of the purchase money, and, on complainant's refusal, brought suit against him for $20,000, which is still pending. Complainant at once employed counsel, and went to Washington, where they found a record of the deed of March 4th in the pat-

ent office. Going thence to York, they·called on Mr. Jessup, and what took place is told by the witness as follows:

"A. I met Mr. Jessup, shook hands with him, and introduced Mr. Oliver to him. I told him I was there in a hurry, and had stopped on some important business. I told him 'I was down to Washington City to-day, and I found on record there that the National Hedge & Wire-Fence Company has a deed for all my patent,—the territory of my patent for the United States.' I asked him how that came. 'Well,' he says, 'I don't know.' I says, 'You remember what territory you bought of me on the 4th of March, 1889?' He says, 'Yes, we bought Baltimore county, Maryland.' I said, 'Do you remember what you paid me for it?' He says, 'Yes; we paid you $25.' I says, 'Do you remember what money you paid me in?' He says, 'No, I don't.' I says, 'You paid me in paper money,—in one and two dollar bills.' I asked him if he remembered anything else besides the $25. He says, 'Yes, we paid your hotel bill.' I asked him how it came that they had such a deed. 'Well,' he says, 'I don't know. I'm ignorant of that. I never knew anything of the contents of that deed until here, recently.' I asked him, 'How long ago?' He said, 'Well, probably six weeks.' I said 'Mr. Brightbill, the party that I have sold New York to, went to put his deed on record, and he found out that the National Hedge & Wire-Fence Company had a deed for the entire United States.' He said that was the first knowledge ever he had. It was Mr. Jonathan Jessup that said that. Q. Did Mr. Jessup say whether he had read the deed? A. He says: 'I didn't read the deed ever. I didn't know the contents that it contained.' He said, 'All we negotiated for was for Baltimore county, Maryland.' Q. Did you call for the deed? A. I says, 'Mr. Jessup, I'd like to see that deed;' and he said, 'The deed isn't in the office now.' I says, 'Where is it?' and he says, 'The deed is at my house.' "

Mr. Jessup promised to call a meeting of the directors of the defendant company, to have the matter made right.

Mr. Henderson Oliver, who was with the complainant, as counsel, gives this account of the interviews with Jessup and with the directors:

At Jessup's office, "Mr. Baldwin and himself shook hands, and he introduced him to me. Mr. Baldwin didn't wait but a moment until he broached the subject with reference to the amount of territory that was covered by that instrument of writing. I cannot give the thing in the same language, or in the same words, but I will state it substantially as I understood it: Mr. Baldwin asked him if he remembered the amount of territory that he sold him on the 4th of March, 1889, and he answered that he did. Mr. Jessup was very busy. It was an evening upon which he was taking in dues for some building and loan association there, and he would have to talk to us at intervals, as he would be interrupted by persons coming in. I think the conversation that I will now detail was about all thrown in together. When he asked him the question if he knew the amount of territory that this company had purchased on the 4th of March, 1889, Mr. Jessup answered him that he did; that they had purchased Baltimore county, Maryland, for that patent. Mr. Baldwin asked him, if he remembered what he paid him for it, and he said that he remembered that he paid him $25. We then went on to talk about the deed covering the whole United States, and Mr. Jessup remarked that he never knew until quite recently—some five or six weeks ago—what that deed contained. At that juncture I asked Mr. Jessup where that deed had been kept, and who kept it. He remarked that he had kept it all the time himself; that it had been in his possession. Then I asked him the question, 'Who had it recorded?' and he says, 'I did.' Says he, 'I sent it, and it was returned to me.' I asked him if he had ever read the deed. He said, 'No;' that he had never read it, and didn't know its contents."

Mr. Jessup refused to talk further, and said nothing could be done until the board of directors met. This meeting was also at Jessup's office; the counsel of the defendant, Mr. Kell, being pres-

ent.  Mr. Krider, the president of the company, was absent from York when the deed was made, and knew nothing about the transaction.  Mr. Jessup said that he was willing to have the matter adjusted right and proper.

"That wasn't his exact language, but it was substantially what he said about it."

The conference with the directors was a fruitless one.

"I think Mr. Kell asked me what propositions, if any, we had to submit. I think Mr. Jessup went and got a sheet of paper, and laid it down upon the table, and, says he, 'Block out,'—no, Mr. Kell, I think, made that remark—to block out whatever propositions we had to make.  I said to them: 'Gentlemen, we've no propositions to make.  We want this territory deeded back. That's what we are here for, and for no other purpose.  We have heard what you have had to say about it.  You're unwilling to accede to our terms, and we'll bid you good evening.'  That is substantially what occurred there."

Meade D. Detweiler, in company with Lancaster D. Baldwin, of Marion, went to York in the latter part of November or the beginning of December, 1893.  This witness is one of complainant's counsel, and testifies to certain admissions made by Jessup in a conversation with the latter.  He (Jessup) said that he had never read the deed over, and that he only learned the contents of it a few weeks before, when Mr. Brightbill, of Annville, Pa., had called to see him.  "I must say," says this witness, "that I asked Mr. Jessup pretty nearly everything that could suggest itself to me, as a lawyer, and tried to get out of him all the facts, and he reluctantly admitted that all the men had intended to buy that evening was Baltimore county, and that that was his understanding of it.  Then I said to him,  *  *  *  'Do you think you ought to keep this deed?'  He said, 'Mr. Detweiler, it is customary for corporations to keep all they have.'"  At this point Jessup "wound up by saying:  'I'll not talk to you any more to-night.  You are both lawyers, and I want to send for our counsel;' and he mentioned Mr. Kell's name.  We stated that we had simply come there to talk the matter over, and to hear what he had to say about it.  He said he would try to have a meeting of the board of directors the next morning."  At a meeting of the board of directors which was held the next day, Mr. Kell asked "what we were willing to give to have this matter adjusted,  *  *  *  and whether we would pay $5,000."  Mr. Baldwin replied that he didn't come there to buy the patent, but wanted the mistake corrected, and the meeting was speedily terminated.

Lancaster D. Baldwin, a brother of the complainant, and a law partner of Mr. Oliver, and who was with Mr. Detweiler at the interview with Jessup and at the directors' meeting, corroborates the latter witness in every material fact stated by the former, particularly as to Jessup's admission that his understanding at the time of the purchase of the complainant's patent was that it was for Baltimore county; that he had never read the deed over, and had only learned of its contents a few weeks before, when Mr. Brightbill had called upon him and informed him that the Na-

tional Company had a deed for the whole United States on this one patent. This witness says he informed the directors, in reply to the proposition of Mr. Kell to pay $5,000, "that we were not there to purchase our patent, but were there wanting back the property that they held and claimed, and which had undoubtedly been assigned by mistake."

Dr. Neiman, who, as manager of the defendant company, together with Gleason, his associate manager, conducted the purchase of the complainant's patent, testifies that the agreement with Baldwin was for the sale of the patent for Baltimore county alone, and such was the intention and understanding of all the parties to the transaction when the deed of March 4, 1889, was executed. But the credibility of this witness has been questioned on the ground that, having this knowledge, he was a passive, if not an active, participant in the negotiations which led to the sale of the patent for the state of Maryland to the Baltimore County Hedge & Wire-Fence Company on the 26th of June, 1889. Further exception was taken to him because he testified that the deed from Baldwin was in the handwriting of Gleason, but afterwards admitted, on having an opportunity of inspecting the paper, that it had been prepared by himself. An additional objection is that he had left the defendant company, was hostile to its interests, and was therefore biased. Jessup had, however, made a similar mistake to that of Neiman in saying that Gleason had prepared the deed. It may be fairly said that, if Neiman's testimony stood alone, it would not furnish that clear and satisfactory proof required to establish the mistake. But the complainant has a right to the value of this evidence, be it great or small, and it cannot be left out of consideration. It is consistent with the history of the case, and is in harmony with the admissions of Jessup. Gleason died in 1890 or in 1891. The complainant, Neiman, and Jessup are the only living witnesses of what occurred immediately before and at the execution of the assignment of the patent to the defendant company.

We come now to the evidence on the part of the defendant company. Their chief witness is Jonathan Jessup, the secretary of the company, who positively and directly denies that he had at any time made the admissions, with one or two unimportant exceptions, testified to by the witnesses for the complainant. His denials are absolute, unqualified, and without explanation. The testimony of the witnesses as to Jessup's admissions is so circumstantial in its details that little allowance can be made for any misunderstanding of what was said by Jessup at the different interviews with him by the complainant and his witnesses. Jessup admits the interviews with him which are testified to by the other witnesses, but, as we have seen, denies that he ever told any one of them what territory the defendant company had bought.

Returning, for a moment, to Detweiler's account of what occurred at the directors' meeting, he states that he and Mr. Kell withdrew into an adjoining room for a few minutes, when the latter in-

quired whether the complainant would give $5,000 by way of set-tlement; and in this connection the following extract from the record is significant:

"X—Q. Did he not suggest to you that the only means of accomplishing what you wanted was a reconveyance by the hedge company, and suggest to you, also, that in view of the existing dispute between the parties the payment of a sum of $5.000 would be, in his opinion, a reasonable method of settlement? A. No; that wasn't the understanding. I said to him, 'Mr. Kell, I know something about this patent business; I have had some experience; and I have heard from your Mr. Jessup that your people only intended to buy Baltimore county, and you only paid $25 for it. Now, in view of these circumstances, it is not right for us, now that you have something wrongful and illegal, to pay such an amount.' I took that position. He went on to say, 'Well, that's a matter to be determined.' I remember distinctly that he said, 'Now, that's a matter to be determined,—that we have thus wrongfully,—and you must prove it.' But he adhered firmly to his position that if we would pay this money the matter could be adjusted."

It will be remembered that this conversation between the coun-sel of the defendant and Mr. Detweiler was had only a few hours after the alleged admissions of Jessup in the hearing of the wit-ness. Is it reasonable to suppose that the witness would have made the statement, "I have heard from Mr. Jessup that your peo-ple only intended to buy Baltimore county," unless it were true, when Jessup was sitting in the next room, and the two men could have been so easily confronted with each other? Mr. Kell was present at the examination of this witness.

It is also important to bear in mind that at none of the interviews which were held with Jessup, or with the representatives of the defendant, was it asserted or claimed by any one that the defendant had intended to buy any other territory than Baltimore county. The position assumed was that the mistake must be proved. Jessup did not deny this statement that he had never read the deed until Brightbill informed him of its contents, nor that he had neglected to put it on record until more than a year after its execution, and only then at the instance of the Baltimore County Hedge & Wire-Fence Company. He states that, when the parties met to execute the deed, nothing was said to indicate what were the terms of the instrument; "Nothing more than that,—that they had come to an agreement." And this remark, he says, was made by Gleason, who did not say what the agreement was. Jessup had nothing to do with making the bargain with the complainant, but trusted every-thing to Gleason, and it does not appear that Gleason ever reported to him what he had bought. But Jessup does throw some light on this extraordinary transaction, in which the complainant, on the face of his deed, sold, for $25, property alleged in the bill to be worth over $50,000, and the value of which is not denied in the answer. Referring to the purpose for which the complainant's patent was needed, he says:

"A. We were organizing a company in Baltimore county, Maryland. When Mr. Baldwin came there on that occasion, Mr. Gleason, who was at that time our field man, said, some time during the day of the 4th of March, he thought he could buy that patent of Mr. Baldwin, and that he wanted to use it down

there. He said he would like to have it,—that he wanted to use it down there in Maryland,—and he was bustling about. He had been in the office once or twice. My impression is, this was in the afternoon. I don't remember that I saw him.any more after that until the evening, when he came into my office with Mr. Baldwin, and said·that they had come to an agreement, and that I was to pay Mr. Baldwin $25."

This goes far in supporting complainant's statement of what he believed and understood to be the subject of his dealings with Neiman and Gleason, and it will also be found to be consistent with other facts in the history of this case. The defendants' witnesses, Samuel C. Heird and John B. Longnecker (the former an officer, and the latter a stockholder, of the Baltimore County Hedge & Wire-Fence Company), proved beyond any question that the original negotiations between the latter company and the defendant were for the purchase of the Baldwin patent for Baltimore county only: "but" (according to Heird) "at the several meetings afterwards the state was taken in, as the territory for the Baltimore County Company." In reply to further questions about the assignment of June 26, 1889, Heird answers:

"Q. Can you recollect how long before this paper was executed the negotiations had taken the form of being for the whole state? A. I should judge it was somewhere along in March or April. Q. In March or April, 1889? A. Yes, sir. * * * Q. Did Dr. Neiman, or Mr. Gleason in Dr. Neiman's hearing, say anything to you, when they had acquired the right to the Baltimore patent? A. I do not know. I do not remember that they did, as to the time when they had acquired it. It was about, to me, the first knowledge of knowing what territory the National Company owned. It seemed that none of us knew until near about that time, and they seemed to own the United States; that is. the National Company. Q. Did they say they owned the United States? A. That was Mr. Gleason's statement."

Longnecker's testimony is substantially to the same effect as that of Heird:

"Q. For what extent of territory for the Baltimore patent were you negotiating? A. Negotiations commenced for the county of Baltimore, but it afterwards included the whole state. Q. About what time did they take the shape of negotiations for the entire state? A. I think it was in the spring of 1889. I am not sure about the date exactly."

The testimony of David W. Krider, the president of the defendant company, is unimportant. He was absent from York in the early part of March, 1889, had no personal knowledge of the terms of the agreement that was made between the· complainant and the defendant, and was not present at the execution of the deed.

It is in proof that the complainant on the 21st of April, 1886, assigned all his rights in his three patents, including No. 274,895, to Garner, Shickle, and Strouse, for the state of Virginia, for the consideration of $500, and that in November, 1892, he assigned his right and interest in the same patent to Brightbill and Gallatin, for the state of New York, for $34,000.

We have reviewed the evidence at some length, and, after a careful examination of all the proofs, we are fully convinced that the parties to the deed of March 4, 1889, mutually committed a mistake, in omitting from that instrument a most important part of

their agreement, to wit, that the use of the patent by the defendant was to be limited to the territory of Baltimore county. It is not necessary to ascertain with precision how such a serious mistake was made. It must have arisen from carelessness on both sides, or by reason of misplaced confidence on the part of the complainant, who was either the victim of a mistake or of fraud. The positive denials by Jessup cannot be allowed to outweigh the equally direct statements of the complainant and his witnesses. If Jessup spoke the truth, the others have spoken falsehoods. Jessup appears to have been a careless and indifferent officer of the defendant company, trusting everything to Gleason. He did not know the contents of this important deed, which, for a nominal sum, conveyed to his company property worth thousands of dollars, and only put it on record, at the instance of the Baltimore County Company, more than a year after its execution. It may be charitably supposed that he was also careless in his talk, forgetful of what he had said, and that he denied his admissions from failure of memory. In the view we have taken of the evidence, it is overwhelmingly in favor of the complainant. Not only the parol evidence, but every incident and circumstance attending the sale and the transfer of the patent, both before and after the execution of the deed, show that the parties were in treaty for a sale for the territory of Baltimore county; and there is not the slightest evidence, outside of the deed, that there was any other agreement or understanding. There is also an entire absence of proof of any assignable motive or reason which could have influenced the complainant to give away such a valuable patent for a mere song. Besides this, it taxes credulity to believe that he gave away more than was asked of him. In Gillespie v. Moon, 2 Johns. Ch. 593, where suit was brought to rectify a mistake in a deed, Chancellor Kent said, "There are circumstances, independent of the parol proof, that afford pretty strong presumptive evidence of mistake." And in the present case we think that all the circumstances point in the same direction.

Immediately on discovering the mistake, complainant employed counsel, who accompanied him to the patent office, in Washington, to examine the record of his deed, and next to York, to request the agents of the defendant company to have it corrected. He was naturally surprised and mortified to find that he had been guilty of such an oversight, and did not anticipate much difficulty in having it remedied. Disappointed in this expectation, he, without delay, sought relief in a court of equity. The jurisdiction of that court in such cases is unquestioned, and the only question in each is whether the proof of mistake comes up to the required standard. Gillespie v. Moon was decided in 1817, and the chancellor, in his opinion, says:

"* * * It appears to be the steady language of the English chancery for the last seventy years, and of all the compilers of the doctrines of that court, that a party may be admitted to show by parol proof a mistake, as well as fraud, in the execution of a deed or other writing."

In an earlier part of his opinion the chancellor, after stating that he had looked into most, if not all, of the cases on this branch of equity jurisdiction, says:

"The cases concur in the strictness and difficulty of proof, but still they all admit it to be competent, and the only question is, does it satisfy the mind of the court?"

In Baltzer v. Railroad Co., 115 U. S. 645, 6 Sup. Ct. 216, the principle applicable to this class of cases is thus stated:

"The mistake must be clearly shown. If the proofs are doubtful and unsatisfactory, and if the mistake is not made entirely plain, equity will withhold relief."

Relief, however, is not denied because there is conflicting testimony, for that would result in a denial of justice in some of the plainest cases. Beach, Eq. Jur. § 546.

Presuming the complainant to be a man of fair character, of average intelligence, and ordinary business capacity, it is almost impossible to believe that he would knowingly and consciously have attempted to sell his patent on three different occasions, to as many different parties,—first for the state of Virginia, then to the defendant company for his whole interest, and lastly, to Brightbill and Gallatin, for the state of New York,—when, on a moment's reflection, he must have known that detection and exposure would certainly follow. To believe otherwise would stamp him as a cheat and a swindler. His reputation, as well as his property, is at stake. He is anxious to save both, and is therefore an interested witness, but his testimony is corroborated by that of Oliver, Detweiler, and L. D. Baldwin; and there is no rule of law that, under the facts of the present case, would exclude reputable counsel from giving testimony in favor of their client. Jessup is also an interested party, and is entitled to no higher credit than the complainant. The latter is supported by other witnesses. Jessup's disclaimers of his admissions stand alone and unsupported. According to Jessup, Gleason wanted a patent for use in Maryland; and there is not a scintilla of evidence to show that it was wanted for any other purpose. The patent contains the complainant's latest improvement. Its value was greatly in excess of the consideration named in the deed, and while inadequacy of price, however gross, is not, of itself, sufficient ground to set aside or reform a contract between parties standing on an equality, it is a material fact, and, in connection with other facts, may amount to proof of fraud or mistake. Bigelow, Frauds, 137; Kerr, Fraud & M. 186; Story, Eq. Jur. § 246; Howard v. Edgell, 17 Vt. 9.

We have no doubt that a mistake was made in reducing the agreement of the parties to writing. To our minds, the evidence is plain that there was no intention on the part of the complainant to sell, or on the part of the defendant to buy, the patent for more territory than Baltimore county. The decree of the circuit court is reversed, and the cause is remanded to that court, with directions to enter a decree finding and adjudging that the instrument

of March 4, 1889, by the mutual mistake of the parties thereto, was so written as to assign and transfer to the defendant all the title and interest of the complainant in and to letters patent No. 274,-895, whereas, in fact, the complainant sold and the defendant bought only the right under the said patent for the county of Baltimore, in the state of Maryland, and it was not intended by either of said parties that said instrument should convey any other or greater right, and for the correction and reformation of said instrument, and for an injunction, in accordance with the prayer of the bill, with costs to the complainant; such decree to be without prejudice to any right under said patent, in and for the state of Maryland, which the Baltimore County Hedge & Wire-Fence Company, of Maryland, may have acquired by virtue of the deed executed to that company by the defendant on June 26, 1889.

BUTLER, District Judge. I am unable to concur in the foregoing opinion, for the following reasons:

The bill rests entirely on an allegation of mutual mistake; there is no suggestion of fraud; and the evidence relied upon to sustain the allegation is not direct, such as that the scrivener who wrote the deed misunderstood his instructions or fell into error in carrying them out, but is indirect, consisting of testimony respecting the intercourse between the parties before, after, and at the time of, executing the deed, inadequacy of consideration and other like circumstances.

The measure of proof required of the plaintiff is not in doubt. The alleged mutual mistake must be so proved as to preclude reasonable dispute. That the weight of the evidence may support it is insufficient; all ground for fair doubt must be removed; Fowler v. Fowler, 4 De Gex & J. 250; Baltzer v. Railroad Co., 115 U. S. 634, 6 Sup. Ct. 216; Beach, Eq. Jur. § 546. If the rule were otherwise deeds would be of little value, and titles to property might as well rest in parol.

The first of the intercourse between the parties, invoked, occurred between the plaintiff (Baldwin), Neiman and Gleason, the two latter representing the defendant, and relates to the verbal understanding which preceded the deed. Gleason is dead and we therefore have the testimony of Baldwin and Neiman alone, as to what occurred between them. They both say the sale of a license for Baltimore county only was talked of or contemplated. Jessup, the defendant's secretary and treasurer, who took the title, and under whom Gleason and Neiman acted, testifies that between him and these agents it was understood that the purchase was to be, and was, of the patent; that both of these individuals informed him at the outset that they could purchase it for a small sum, and the acquirement of a license was not suggested at any time. The effect of Jessup's testimony it must be observed is not simply to discredit Neiman; it is direct and positive evidence of Jessup's understanding of the transaction; and as he represented the defendant in taking the title it bears directly on the question of mutual mistake. If Jessup so understood the contract there could

not be mutual mistake, however Baldwin may have understood it.

At the execution of the deed Baldwin, Neiman and Jessup were present. The first two testify that the contract was talked over, and that it was fully understood that the sale was of a license for Baltimore county. Jessup denies this in positive and emphatic terms, testifying that he understood then, as before, that the verbal contract was, and that the deed was to be for a transfer of the patent; and that he did not hear a suggestion to the contrary. Baldwin further says he signed the deed without reading it, or asking to have it read; while Jessup testifies that he, Baldwin, read it over and expressed his satisfaction with its terms; and Neiman says he has no recollection whatever on the subject. If these witnesses are entitled to equal credit the testimony is pretty equally balanced. The record, however, seriously impeaches the credit of both Baldwin and Neiman. Baldwin's description of what occurred at the execution of the deed is so graphic, positive, and particular, notwithstanding four years had passed, as to excite suspicion; and when it is seen that no part of this description is corroborated, even by Neiman who was present, that all of it is denied by Jessup, and that material parts of it are otherwise proved to be untrue, it is difficult to repose confidence in anything he has said. But in addition to this, the confession of his conspiracy with Gallatin to obtain money from Brightbill on this patent by means of falsehood and deception, and his prevarications when his attention was first. called to this subject as a witness, prove him in my judgment to be entirely unworthy of credit where his interests are involved. As respects Neiman he had left the defendant's employment in ill humor; and his own testimony besmirches his character. He discovered the alleged mistake after a short time as he admits, but instead of seeking to have it corrected, or even mentioning it to Baldwin, he participated in selling a license under the deed for the state of Maryland. He testified when first called, with positiveness, that Gleason (who could not then be heard to the contrary) prepared the deed; and yet when subsequently confronted with the paper he was forced to admit not only that Gleason did not prepare it, but that he, Neiman, did! Of course this may have been an honest mistake, but if so it was a remarkable one; and it at least shows the witness' memory to be unreliable. He does not undertake to explain how it occurred that he who had just completed the bargain with Baldwin for a license, as he says, should have written a transfer of the patent itself, instead of such an interest under it. That such a mistake should have been made by one so familiar with the subject seems incredible. At all events it is sufficiently remarkable to have justified an attempt to explain it.

The subsequent correspondence between the parties about the purchase of licenses, or "territory," invoked by the plaintiff, if any such correspondence occurred, does not seem important. No part of it is produced, and what it was, (if any occurred) is uncertain. The defendant's theory respecting it is as reasonable as the plaintiff's. Mr. Baldwin had other hedge-fence patents to which such

correspondence might be referred; and as it must be supposed that the defendant then knew that it owned this patent, it is unreasonable to believe that the correspondence related to it. The plaintiff says the defendant knew it, and withheld the deed from record to prevent him discovering it.

As respects the alleged subsequent admissions, there is the same conflict of testimony. Jessup and Krider, who were present at the interviews during which they are said to have been made, deny them; and it seems unreasonable to believe that they should have been made in view of the fact that Jessup, to whom they are attributed, claimed that the patent rightfully belonged to the defendant. It is conceded that he desired to avoid making such admissions; and therefore, it is said, he made them "reluctantly." Why should he have made them at all under such circumstances? He appears to be an intelligent man fully able to take care of himself. His conduct is irreconcilable with the idea that he made them. As he stood firmly on the deed throughout the several interviews, it seems incredible that he should have admitted it to be valueless. The three or four attorneys for Mr. Baldwin who testify on the subject, were present to obtain admissions, and as some of them say they cross-examined Jessup sharply, and obtain what one of them denominates "reluctant admissions." I do not attach importance to such testimony. But moreover it must be borne in mind that this testimony is not admissible for any other purpose than that of discrediting Jessup. It cannot be used to support the plaintiff's case—to prove the allegation of mutual mistake. Jessup had no authority to admit away the defendant's rights. Its title could not be affected by anything he might say at the time referred to. The fact that he had taken the title for the company is unimportant in this respect.

I attach no weight whatever to the inference sought to be drawn from the alleged inadequacy of consideration. If the consideration was greatly inadequate the fact would be material. I do not believe however that it was inadequate. What reliable evidence is there that the patent was worth more than was paid for it? A majority of patents issued are valueless. The plaintiff had held this one for seven years before the transaction in question, and never realized a cent on it, unless it be the price of a license for Virginia. He alone testifies to the price of this license; and if he got it by means similar to those subsequently employed to effect a sale to Brightbill it affords no evidence whatever of value. He continued to own the patent as he supposed, if we believe his testimony, for four years longer without realizing anything on it, honestly. To cite the transaction with Brightbill as evidence of its value is wholly unjustifiable. Brightbill's money was obtained by a bald and bold fraud, according to the plaintiff's own testimony. This man was made the victim of a conspiracy to cheat, by means of false pretenses, deserving of punishment as well as of denunciation. How much of Brightbill's money the plaintiff will be able to retain cannot be known until the suit brought to recover it back is determined.

Nor do I attach importance to the fact that the plaintiff offered the patent for sale after the transaction with the defendant. Supposing him to be an honest man it would be evidence that he was mistaken respecting the deed, but would not tend to show that the defendant was. In the light of the transaction with Brightbill, however, I cannot regard him as an honest man, and on that account also I would attach no weight to the fact that he made such subsequent offers.

It is not true as urged that the defendant needed only a license for Baltimore county; and the fact would be of small importance if it were. At the date of the purchase the defendant needed, as I understand the testimony, a right for the state of Maryland, to enable it to comply with the contract which was soon after carried out (in part) by executing the license before mentioned, under this deed.

It seems idle to attach importance to the defendant's delay in recording the paper. The failure to record deeds, even for land, is so common that numerous statutes have been enacted, to avoid the consequences. The suggestion that the failure to record was inspired by a desire to conceal the character of the instrument is repelled by the fact that the defendant published its character by granting the license for Maryland, (which was immediately recorded) in which the assignment is set out.

The object of this cursory review is not to show that a mistake was not made, but to show that none is proved with the clearness necessary to justify the court in setting aside the deed. If the question was one depending on the weight of evidence merely, I would entertain doubt how it should be decided. Remembering that the deed was made expressly to bear witness to the transaction, so as to exclude the necessity of relying on parol testimony; that it was prepared by Neiman who had just made the purchase and was therefore familiar with the contract, and the subject-matter to be transferred; that it seems incredible that he could have written an assignment of the patent when he knew a license under it for a small territory only was intended (the two instruments being dissimilar in form as well as in substance), I could not say that the weight of the evidence is with the plaintiff. But as the case depends not on the weight of evidence, but on the existence of such overwhelming preponderance as leaves no room for reasonable controversy or doubt, I feel no hesitation in saying that the plaintiff has not, in my judgment, succeeded, and that the bill should therefore be dismissed.

NOTE. I would not express a dissent in this case (for it is not pleasant to do so) if the judgment about to be entered was not one of reversal, which must rest on the conclusions of two judges, against the conclusions of two others (including the judge who sat originally) of equal grade. Under such circumstances it seems to me proper that the record should show that the judgment of this court is that of a majority only of the judges who sat. That important principles of law or important interests of parties, should thus be finally determined seems to me unwise and unjust. Of course the entry of such judgments cannot be avoided; it is the duty of the majority to decide; but the supreme court may afford a remedy under its discretionary authority to review

the judgments of this court, where the fact referred to is noted. Doubtless in all the circuits, as has frequently occurred in this, judgments of reversal resting on the conclusions of two of the three judges of the court of appeals are entered as if the court was unanimous, because of the natural reluctance of judges to dissent. I of course am speaking only for myself; others may view the subject differently. I believe however that if the supreme court does not afford a remedy in such cases that congress must.