## BARKER v. PULLMAN'S PALACE CAR CO.

(Circuit Court, S. D. New York. July 31, 1903.)

1. CONTRACTS—PERSONS ENTITLED TO ENFORCE—CONTRACT FOR BENEFIT OF ANOTHER.

By a contract between two corporations, one agreed to sell and transfer to the other all of its property and existing contracts; the transfer to be made on a specified date, when the selling company was to be dissolved. By a provision of the contract, the purchasing company agreed that, to enable the selling company "to make an immediate settlement of its affairs and distribution of its assets," the purchasing company, as a part of the transaction, would satisfy and discharge the indebtedness and liabilities of the other company, of any and every kind, which might be unsatisfied at the time of the transfer. Held, that, while the primary purpose of such provision may have been the benefit of the selling company, it was also incidentally intended for the benefit of its creditors, since it was about to dissolve, and that a creditor could enforce such provision against the promisor, as one made for his benefit.

2. REFORMATION OF CONTRACT—RIGHT TO MAINTAIN SUIT—ASSUMPTION OF CONTRACT BY ANOTHER.

Where one corporation purchased all the property, assets, and good will of another, paying therefor with an issue of its own stock, the same being distributed among the stockholders of the second company, which thereupon dissolved, and, as a part of the transaction, assumed and agreed to perform all of the contracts of the selling company, and satisfy and discharge all of its indebtedness and liabilities, of any and every kind, a party to an existing contract with the selling company may maintain a suit against the purchasing company for its reformation on the ground of mutual mistake, whether or not the defendant had knowledge of the mistake.

3. SAME—GROUNDS—MUTUAL MISTAKE.

Where negotiations for a contract were between agents or representatives of the respective parties, and the contract, when reduced to writing,

was presented to one of the principals and signed by him, and was then signed by the agent for the other party on its behalf, afterward being submitted to his principal, and not objected to, evidence that the agents understood the terms of the contract agreed upon to be different from those embodied in the writing is not sufficient to establish a mutual mistake on the part of the principals, which would warrant the reformation of the contract as written.

## In Equity.

This action was originally commenced in the Supreme Court of the state of New York, and on being removed into this court the complainant filed herein his bill of complaint, praying the reformation of a certain contract or agreement entered into on the 10th day of March, 1898, between the Wagner Palace Car Company and the Agricultural Insurance Company, and for the recovery of $4,088.06 damages against said Pullman Company, with interest from August 13, 1900, by reason of an alleged violation of said agreement by the Pullman Company; it having assumed, it is claimed, to satisfy and discharge the liabilities of the Wagner Company, of any and every kind, etc., by an agreement in writing made November 8, 1899, between the Wagner Palace Car Company and Pullman's Palace Car Company; the Agricultural Insurance Company having duly assigned to the complainant (it is alleged) its cause of action under the first-mentioned agreement against the said palace car companies, and all the interest of said insurance company of, in, and under said agreement of March 18, 1898.

Cardozo & Nathan, for complainant.
Alexander & Green, for defendant.

RAY, District Judge (after stating the facts as above). The Pullman Company, or Pullman's Palace Car Company, is a corporation created and existing under and by virtue of the laws of the state of Illinois, and is a citizen of said state. The Agricultural Insurance Company is a corporation created and existing under and by virtue of the laws of the state of New York, and as such duly authorized and empowered to do and transact a fire insurance business in said state. At the times mentioned the Wagner Palace Car Company was a joint-stock association, consisting of more than seven members, organized and existing under the laws of the state of New York, and having its principal place of business in the county of New York. Both the Pullman Company and the Wagner Company for many years were respectively engaged in the business of carrying passengers for hire in their cars over the lines of public railroads in the state of New York and elsewhere, and, for the purposes of their said business, owned, respectively, many cars, stations, buildings, and other property, which were subject to loss or damage by fire, and said Pullman Company was accustomed to, and did, obtain insurance. In and about the month of March, 1898, the established rate of premium for fire insurance on such risks was the sum of $35 for every $1,000 of insurance. On the 10th day of March, 1898, a memorandum of agreement was made and entered into between the said the Wagner Palace Car Company, by W. S. Webb, its president, duly authorized, and the said the Agricultural Insurance Company, in the words and figures following, viz.:

"Memorandum of Agreement, made this tenth day of March, 1898, between the Wagner Palace Car Company and the Agricultural Insurance Company: Witnesseth:

"That in consideration of one dollar and other valuable considerations, the Agricultural Insurance Company agrees, on the expiration of the present Insurance policy of the Wagner Palace Car Company, to renew the same for three years for the rate of 29 17/100 annual premium, payable in nine equal installments, one each in September, October and November, respectively of each year.

"The Agricultural Insurance Company agrees to give substantially the same Companies comprising the syndicate now on the risk.

"In witness whereof the parties hereto have hereunto appended their signatures and seals the day and year first above written.

          "The Wagner Palace Car Company,
             "By W. S. Webb, President.
          "The Agricultural Insurance Co.,
"Witness, F. G. Smith.          By —————."

It will be noted that this agreement, as executed, contains no covenant or agreement on the part of the Wagner Company to accept a renewal of insurance or to pay the premiums, and the complaint seeks to reform same by inserting the words "and the said Wagner Palace Car Company agrees to accept such insurance for the term of three years as aforesaid," before the attestation clause of said agreement, it being alleged that such words were left out by the mutual mistake of the parties to such agreement. The fair construction of the contract or agreement of March 10, 1898, is that in consideration of one dollar and other valuable considerations the insurance company agrees to renew certain insurance of the Wagner Company at the rate and on the terms mentioned. The Wagner Company does not agree (unless such an agreement on its part will be implied) to accept the insurance or pay the premiums mentioned. If no such agreement is implied, and the evidence does not justify the reformation asked, that is an end of the case, for no one will contend that damages may be recovered for refusing to accept insurance (which is the ground for damages alleged in the bill of complaint) unless there was an agreement to accept such insurance.

After the execution of the agreement of March 10, 1898, and on the 8th day of November, 1899, the Wagner Palace Car Company, by W. Seward Webb, its president, and Pullman's Palace Car Company, by Robert T. Lincoln, its president, entered into a written agreement as follows:

"Whereas, the Wagner Palace Car Company, a joint-stock association formed under the laws of the State of New York, hereinafter called the 'Wagner Company,' party of the first part, and Pullman's Palace Car Company, a corporation organized under the laws of the State of Illinois, hereinafter called the 'Pullman Company,' party of the second part, have entered into an agreement subject to ratification by the stockholders of both companies, for the sale of the property and assets of said Wagner Company to said Pullman Company, and said agreement contemplated the preparation and execution of a more formal contract between said companies; and

"Whereas, the Directors of said Wagner Company have taken appropriate action to secure the dissolution thereof on the thirtieth day of December next,

"Now therefore, in consideration of the premises and of one dollar paid by each of the said parties hereto to the other, receipt whereof is hereby acknowledged, and of the covenants and agreements hereinafter contained, to be kept and performed by the respective parties hereto, it is covenanted and agreed by and between said parties as follows:

"First. Said Wagner Company shall sell, assign, convey and transfer unto said Pullman Company all of its cars, equipment, real estate, plant, good will

and other assets and property, including its contracts with railroad companies for the running of sleeping and other cars on their respective railroads, and shall procure the assent of said companies to such assignment.

"Second. In consideration of such sale, conveyance and assignment, said Pullman Company shall cause its capital stock to be increased from the amount of five hundred and forty thousand shares of the par value of one hundred dollars each, now authorized, to seven hundred and forty thousand shares of the same par value, and shall cause the two hundred thousand (200,000) shares, thus added to its capital stock, to be issued and delivered to said Wagner Company, or to its directors as liquidating trustees, in full payment for said property, assets and good will, and to be distributed by said Wagner Company, or said liquidating trustees, to the shareholders in said Wagner Company in proportion to their respective shares in such assets and property.

"Third. Said property and assets shall be conveyed, transferred and assigned by said Wagner Company, or said liquidating trustees, or both, and the certificates for said two hundred thousand shares of capital stock of said Pullman Company shall be issued and delivered in payment therefor on the thirtieth day of December, 1899.

"Fourth. Until such conveyance and assignment shall be executed, the officers of said Wagner Palace Car Company shall carry on the current business thereof, and shall not make any new contracts with railway companies or cause extraordinary or unusual liability or expenditure to be incurred; and shall not make any change in the organization of the company by the employment of new officers or increasing the compensation of officers and employees or otherwise; and the property and assets to be conveyed and transferred, as aforesaid, shall be the property and assets the said Wagner Company shall have, or be entitled to, on said thirtieth day of December, 1899. The intent of this provision is that the present condition of the assets, liabilities, obligations, contracts and business arrangements of the Company shall be preserved as it now is until such conveyance, so far as the same shall be consistent with the ordinary routine conduct of its business. As the Pullman Company is now paying dividends at the rate of eight per cent. per annum, therefore in order to equalize the rates of dividends upon the two stocks, pending the carrying out of this agreement, it is further agreed that the Wagner Company shall hereafter declare a dividend of no more than one-third of one per cent. upon its capital stock, the payment whereof, with the dividend already declared and payable on the fourth day of November, A. D. 1899, making a total of one per cent. upon the capital stock.

"Fifth. In order to enable said Wagner Company to make an immediate settlement of its affairs and distribution of its assets without the delay incident to the payment of its indebtedness and liabilities, said Pullman Company agrees that it will, as a part of the transaction, satisfy and discharge the indebtedness and liabilities of said Wagner Company of any and every kind which may be unsatisfied at the time of the transfer of said assets, and the Pullman Company further agrees to indemnify and save harmless the said Wagner Company and said liquidating trustees and the shareholders in said Wagner Company from all costs, damages and expenses by reason of the failure or neglect of either of said companies to pay, satisfy and discharge the same.

"This agreement is made subject to such ratification by the stockholders of both companies as may be required by law, or the charter or articles of association of said companies, or either of them.

"In witness whereof, the parties hereto have caused the signatures of their respective Presidents and their respective corporate seals to be affixed hereto, this eighth day of November, 1899.

"Wagner Palace Car Company,

"[Seal.]                              By W. Seward Webb, President.

"Pullman's Palace Car Company,

"[Seal.]              ,              By Robert T. Lincoln, President."

This agreement was consummated, and the Wagner Palace Car Company ceased to do business.

The insurance company tendered the renewal of the insurance in accordance with the agreement of March 10, 1898, and offered to fully perform same; but the Pullman Company, denying any obligation under said agreements to take insurance and pay premiums, refused to take the insurance tendered.

There is no question as to the amount of damages, if any, provided it is found that the Pullman Company, by making the agreement of November 8, 1899, with the Wagner Palace Car Company, assumed the obligations of the agreement of March 10, 1898, and there was an obligation created by that agreement, as it actually was made, on the part of the Wagner Palace Car Company, to accept the insurance therein mentioned, and this complainant may maintain this action. It is contended by the defendant (1) that the Wagner Palace Car Company, or its liquidating trustees, are indispensable parties to this suit; (2) that this complainant cannot maintain an action on the contract between the Wagner and the Pullman Companies, whereby the Pullman Company agreed to discharge the indebtedness of the Wagner Company, since neither he nor his assignor, the Agricultural Insurance Company, was a party to that contract, and it was not made for their benefit or for the benefit of either of them; (3) that to hold the defendant upon the contract between the Agricultural Insurance Company and the Wagner Company, there must have been a novation, the original contract canceled, and a new one between the Agricultural Company and the defendant substituted therefor, and the Wagner Company released from its obligations under the old contract; (4) that the complainant fails to show any title in himself to any alleged right of the Agricultural Insurance Company to secure a reformation of the contract; (5) that the complainant has failed to show any mutual mistake or other ground upon which the agreement between the Wagner Company and the Agricultural Insurance Company can be reformed by the insertion of the words proposed to be inserted, or their equivalent, and that in no event can this complainant maintain an action for the reformation of that contract; (6) the Pullman Company never agreed to discharge the liability of the Wagner Company, if any, on the contract between the Wagner Company and the Agricultural Insurance Company, even should it be reformed as asked; (8) that, under the proofs the Agricultural Insurance Company suffered no damages by reason of the refusal of the Pullman Company to take the policy tendered, and that as, under the statutes of the state of New York, the holder of a fire insurance contract has the absolute right to terminate it at any time, there could be no liability for damages in the present case under any circumstances. The defendant also insists that, conceding, for the purposes of argument, that the contract was performed for the Agricultural Company, and that it should be reformed as prayed, still no breach of it on the part of the Wagner Company has been shown.

The agreement of March 10, 1898, is complete and perfect in itself. In consideration of $1 and other valuable considerations (not mutual covenants and agreements therein contained, implying that such were in fact made, and should have been inserted), the Agricultural

Company agrees, on the expiration of a then existing policy of insurance, to renew the same on the terms mentioned. It may be claimed that it could not renew insurance unless the Wagner Company accepted the policy. But this agreement, as written, is in the nature of an option. The Wagner Company has paid for the agreement of the insurance company to renew the insurance, and may enforce the agreement, and insist on having what it has contracted for. But this is very far from justifying an implied agreement on the part of the Wagner Company to accept the insurance. There is nothing in the context of the agreement indicating the necessity for any such covenant to make it a complete contract, and one in accordance with the intent of the parties. It will be presumed, with such language only, that the Wagner Company did not intend to obligate itself to accept the renewal of the insurance. Zorkowski v. Astor, 156 N. Y. 393, 50 N. E. 983; Hale v. Finch, 104 U. S. 261, 26 L. Ed. 732; Hudson Canal Co. v. Penn. Coal Co., 8 Wall. 276, 19 L. Ed. 349.

Indeed, complainant admits that no covenant or agreement to accept the renewal of the insurance can be implied. The brief of his counsel says, "Under the authorities, no implied covenant may be drawn from the language employed in the agreement herein." Hence equitable relief is sought in this action, with the recovery of damages as an incident, on the ground that the covenant or agreement to accept the renewal of the insurance was omitted from the written contract by mutual mistake. That is, that both parties agreed that such a provision should go in the written agreement, but that by the error or oversight of the parties or draftsman it was left out, and the omission not discovered and assented to by the parties at the time. The defendant denies any error or omission or mutual mistake. What is the evidence on this subject?

Charles S. Barker, the complainant, and the agent of the Agricultural Insurance Company at the time the agreement was made, says, in substance, that he had authority to make the contract, and conducted the negotiations on the part of his company; that prior to March 10, 1898, and in February, he called on F. G. Smith, the private secretary of Dr. W. S. Webb, the then president of the Wagner Palace Car Company, at Webb's office, in the city of New York, and had the following conversation (given here, with the other evidence on this subject, in full):

"A. I called on Mr. Smith, and told him that, if the doctor would give me a three-years contract for placing the insurance, that I could do it for two and a half years' premium, thereby saving nearly one-sixth of the premium, or reducing the rate from 35 cents to 29.17 per hundred dollars worth of insurance. Q. You have referred to 'the doctor' in your answer. Who did you mean? A. The president of the Wagner Palace Car Company. Q. What did Mr. Smith say? A. Mr. Smith said that he thought it was a good idea, and he would communicate with the doctor. Q. Did you have any further conversation on that subject at that time? A. I did not."

He then says:

"Q. When next did you hear from the Wagner Company, or any one representing it, in regard to the fire insurance? A. Within a few days I received word from Mr. Smith to call and see him; he had an answer from the doctor. Q. State what took place, and who was present? A. Mr. Smith and I were alone, and he stated that he had received an answer to a telegram that he

had sent to the doctor, stating to leave it until he got home, and he would look into the matter. Q. Subsequently did you hear further from Mr. Smith, or any one representing the Wagner Company? A. I did. Q. About when? A. It was about the first part of March I received word from Mr. Smith to call at their office. Q. Did you call at Mr. Smith's office? A. I did. Q. With whom, if any one, did you have a conversation? A. With Mr. Smith. Q. Was any one else present? A. There was not. Q. State the conversation in the early part of March? A. Mr. Smith said the doctor had agreed to accept my offer for three years' insurance for two and a half years' premium. Q. Was there any change in the fire insurance to be effected for the Wagner Company, other than the length of time for which you would effect the insurance? A. A lower rate of premium. Q. The subject of discussion between you and Mr. Smith was for a reduction of the premium on the agreement of the Wagner Company to take insurance for three years. Is that right? A. Yes, sir. That was it. Q. What next occurred in regard to the fire insurance of the Wagner Company? A. Mr. Smith thereupon asked me if I wanted a contract. I told him I did, and he drew up a rough sketch of a contract, and asked me if that was about what I wanted. I told him it was. He said then, 'I will have it typewritten and forward it to the doctor, or the doctor will be down in a few days, and have him sign it, and when that is done I will send it to you.' Q. Did you later hear from Mr. Smith in regard to this contract? A. I did. Q. About when? A. About the 7th or 8th or 9th or 10th— somewheres along the first part of March, 1898. Q. Had the draft agreement been typewritten? A. It had. Q. What was said when you called on him at the time you last referred to? A. He handed me the agreement, and told me the doctor had signed it, and it awaited my signature. Q. Is the paper shown you the typewritten agreement which he then handed you? (Handing witness paper.) A. It is. Q. Do you know the signature of Dr. Webb, the president of the Wagner Company? A. I do. Q. Is the signature attached to that paper the signature of Dr. Webb? A. It is. Q. And is this other paper which I show you an exact copy? A. Yes, sir. * * * Q. Was a duplicate original of this paper, marked 'Complainant's Exhibit A,' signed on behalf of the Agricultural Insurance Company, and, if so, by whom? A. It was, and signed by me, 'Agricultural Insurance Company, Charles F. Barker, Agent.' Q. And was the duplicate original so signed by you, as agent of the Agricultural, delivered to Mr. Smith? A. It was. Q. At the same time that you received the copy signed by Dr. Webb? A. It was. Q. Was the first draft of the contract prepared by Mr. Smith before you called upon him? A. It was. Q. Was the typewritten copy which was subsequently signed, made by Mr. Smith, or in his office? A. It was. Q. Is it a fact that you had no part whatever in the preparation of the written contract? A. Yes. I had no part in it. I had nothing to do with it. Q. Did you make any examination of the draft contract, except as you have testified, when you read it over once in the office of Mr. Smith? A. No, sir. * * * Q. What did you do with the contract of March 10, 1898, after you signed it? A. I gave it to Mr. Smith. Mr. Smith had it. I signed it in his presence, and he kept it. Q. The duplicate—what was done with that? A. I took the duplicate. Q. What did you do with it? A. It is here. Q. Have you always had it in your possession, ever since? A. No; it was in Watertown. The company had it there for a while. Q. How long did they have it? A. Oh, I don't know. Some time. Q. When did the company first know that that contract was made? A. When it was made. Q. Did you advise them immediately? A. I did. Q. This alleged contract of March 10, 1898, was made and executed by you after you and Mr. Smith had fully discussed the terms upon which it was to be made, was it not? A. After the doctor had executed it, then I signed it; yes. Q. But you and Mr. Smith had discussed it before it was submitted to Dr. Webb—discussed the matter? A. Yes, sir. Q. And then the contract was drafted? A. Yes, sir. Q. Then it was submitted to you? A. Yes, sir. Q. And after it was approved by you it was signed by Dr. Webb, and then signed by you. Is that right? A. Yes, sir. Q. Did you take the draft away from Mr. Smith's office after it was handed to you? A. I don't think I did. Q. You think you sat there and read it and passed upon it there? A. Yes, sir. Q. Is your recollection clear about that? A. I think it

is. Q. Did you discuss it with any one else than Mr. Smith? A. Yes. Q. After it was done? A. No; it was before it was done. Q. Who did you discuss it with? A. Our superintendent. Q. Did you show him the contract? A. I did not show him the contract. I told him what was going to be done. Q. Did you make any suggestions when you talked to Mr. Smith about the draft, as to the terms of the contract? A. No; only that they did not want— As the contract says, they did not want to pay for all the three-years policies at once, and therefore we put in that they should pay on the 1st day of September, October, and November in each year one-third of the amount on each month, the same as they had previously done. They never paid for their policies all down at once. Q. That was a matter of discussion between you and Mr. Smith at the time the draft was before you? A. Yes, sir; and I told him that would be satisfactory. Q. Was the policy issued in 1898 a standard form policy, of the New York form?' A. Yes, sir. Q. And all policies issued subsequent to the 10th day of March, 1898, were standard policies? A. Yes, sir. Q. As provided by the New York law? . A. Yes, sir. Q. Did you send the original of the contract of March 10, 1898, to the office in Watertown? A. I took it there. Q. And left it there? A. I left it there. Q. When did you get it back? A. Oh, I got it back within three or four days. I took it up, showed it to the president and secretary, and they looked at it, and I brought it back with me and kept it in my safe. Q. Did they make any objection to it? A. No, sir. Q. And you kept it from that time to the present time, did you, except as you have given it to your attorneys? A. Yes, sir. * * * Q. There is nothing in your contract of March 10, 1898, giving you compensation from the Wagner Company, is there? A. Giving me compensation from the Wagner Company? Q. Yes? A. No, sir. Q. The only compensation that you looked for, then, was from the insuring companies? A. Yes, sir. * * * A. That was put there, not that I offered the policies to them in Chicago at all, but I was in Chicago in July. The policies then had not been written. Q. In July, 1900? A. Yes, sir. Q. Did you go there for the purpose of getting the Pullman business? A. Yes, sir. Q. And they at that time notified you that they were going to cancel the existing insurance, and that they refused to take any more insurance from the Home, did they not? A. They told me that my policies would not be needed—the renewal would not be needed. Now, if you will let me put a little explanation in here. Mr. Robertson, when he was here, and when I was doing that work for them, gratis, you may say—all those changes for them, and canceling policies—he told me that my contract would be carried out up to the minute, to the letter; and Mr. Hough, his assistant, told me the same thing. They told me that they would give me a schedule of the Pullman business, and if I was the lowest man I should have it. That is what took me to Chicago. Not to see them in reference to this. Q. Well, when you say 'my contract,' what do you mean? A. I mean the contract of the Agricultural Insurance Company—the contract with the Wagner Company, that that should be lived up to. Q. They told you that if you put in the lowest bid that you would get the business? * * * Q. You have said that you discussed with Mr. Smith the time at which premiums should be payable. Is it not the fact that such discussion was prior to the first draft in writing of the contract? A. Yes, sir. Q. And is it a fact that you made no changes in the form of the contract as first prepared by Mr. Smith and as subsequently typewritten in his office? A. No changes whatever."

Frank G. Smith, private secretary to Dr. W. S. Webb, says:

"A. I had a conversation with Mr. Barker in the office of the president of the Wagner Palace Car Company. Q. When, about? A. It was some time in the latter part of February or March, 1898. I don't recall the exact date. Q. Did that conversation relate to placing fire insurance for the Wagner Company subsequent to the renewals of existing policies? A. Yes, sir; it did. Q. You remember the contract of March 10, 1898 (Exhibit A), do you not? A. Yes, sir; I remember that. Q. By whom was that contract first drafted? A. My recollection now is, it seems to me, that I dictated it to some one, or I may have written it in my own writing. I don't recall. Q. But it was either your draft or your dictation? A. Yes, sir; either one or the other. I

could not say which.  Q. Was that done in your office?  A. Yes, sir.  Q. Do you recall, in substance, the conversation that you had with Mr. Barker in regard to the making of this contract?  A. Yes, sir; I do.  Q. Will you state the substance of the conversation had with the complainant prior to the making of that contract, Exhibit A?  A. Why, in substance— We heard that the powers in insurance circles were making rules and fixing to increase our rates, so then—•  Q. Was this a part of the talk?  A. That was a part of the talk; yes, sir.  So I sent for Mr. Barker, and that is why I sent for him. I said to Mr. Barker that we had heard of a likelihood of the rates being increased, and would like to take what action we could to protect ourselves, and asked him if he could help us out, in the way of making any suggestion for our benefit.  Mr. Barker suggested that we make a three-years agreement then and there, if we could, and that would protect us anyway for three years. It seemed an excellent suggestion to me, and I sent word immediately to the president, who happened to be out of town, and in the meantime I went on with Mr. Barker.  It seems to me that he was there twice.  I am sure he was there twice.  And I drew up this agreement.  (Indicating Exhibit A.)  Q. Before making that contract, what was said about the three-year term?  A. That it would protect us for three years, and operate as a very substantial reduction in our yearly premium.  Q. Was it a part of the conversation that the Agricultural Insurance Company should take the insurance through Mr. Barker for three years?  A. Yes, sir; it was.  Q. So far as you recollect, was any change made in the draft contract which you dictated?  A. I don't recollect.  I don't think there was.  Q. And was the contract signed by W. S. Webb, president of the Wagner Company?  A. Yes, sir.  Q. And was a duplicate signed by the Agricultural Insurance Company, by C. S. Barker, agent? A. Yes, sir.  Q. Was that contract, so signed by the Agricultural Insurance Company, turned in to the Wagner Company?  A. Yes, sir.  Q. And did the Wagner Company, after the execution of that contract, receive from the Agricultural Insurance Company a policy or policies on the Wagner Company's property for the year commencing from August 13, 1898?  A. Yes, sir.  Q. And did the Wagner Company likewise receive through the Agricultural Insurance Company policies on its property for the year beginning from August, 1899?  A. Yes, sir; it did.  Q. Did the Wagner Company receive about the first of August, 1900, a third policy for $7,008,100, or thereabouts, covering property which was then or had theretofore been owned by the Wagner Company?  A. Well, such a policy was delivered to me, representing Dr. Webb; and he can be, I suppose, considered as representing the Wagner Company, if there was any at that time.  Q. What did you do with the policy thus received in the early part of August, 1900?  A. I handed it immediately to some representative of the Pullman Company; probably Mr. Yaeger, he being the nearest.  Q. Do you mean Mr. J. C. Yaeger, an assistant general superintendent of the Pullman Company?  A. That is the man.  If it was he to whom I handed it.  Q. Are you sure you handed it to some one in charge of the Pullman office in the city of New York?  A. I am quite sure I did; yes, sir.  * * *  Q. You had no authority yourself to execute contracts for the Wagner Company, did you?  A. Not except in matters that Dr. Webb might delegate to me.  Q. Did you ever execute a contract for the Wagner Company?  A. No, sir.  Q. All contracts which you drafted or had submitted to you, you submitted to the president, did you not, for his action? A. Yes, sir.  Q. And in this case, after the contract in suit (Exhibit A) was drafted, you submitted that to the president, did you not?  A. Yes, sir.  Q. In the form of which it was executed?  A. Yes, sir.  Q. So far as you know, President Webb had no conversation with Mr. Barker, or with any person representing the Agricultural Insurance Company, with reference to the terms of the contract, before it was executed?  A. I am not sure about that.  Mr. Barker was in the office at times when Dr. Webb was there.  Q. So far as you know, did he have any such conversation?  A. I can hardly say positively. I know he was in the office.  What kind of an answer do you want from me— 'Yes' or 'No,' or what?  Q. I want to know, 'Yes' or 'No,' whether you know of his having had any conversation with the president?  A. I don't remember. He might have, but I don't remember.  Q. You don't know that he did?  A. No, sir.  Q. Do you know the date of the conversation as to which you have

testified? A. I don't remember; no. Q. Have you any means of fixing it? I am referring to the conversation with Mr. Barker. A. I cannot think of any open to me now. Q. Do you know how long it was before the contract was signed that you had that conversation? A. No; it was some little time. * * * Q. After your conversation with Mr. Barker, shortly prior to the execution of the contract of March 10, 1898, did you have a conversation with Dr. W. Seward Webb, the president of the Wagner Company, in regard to the proposed contract? A. Yes, sir; I did. Q. In that conversation with the president of the Wagner Company, did you say that the Wagner Company was to take insurance for three years, and secure an agreement from the Agricultural Insurance Company to furnish it for three years, in substance? A. Why, I certainly said the substance of that, for the reason that the whole intent of our getting that three years' insurance was that it saved us one-sixth of the premium we were paying. It was the lowest insurance we had ever had, and by agreeing to take it for three years we certainly did save one-sixth of our regular premium, which was quite a sum of money. We were well pleased. Q. State in substance just what you said to Dr. W. Seward Webb, president of the Wagner Company, in regard to the terms of the contract? A. I explained the matter fully to President Webb—the object in our taking the three years' term of insurance was to protect ourselves against— Q. If you said that to Dr. Webb, state it. A. Yes, sir; I did. Q. Now, state what you said to Dr. Webb. A. I said to Dr. Webb, 'We had better take this three years' insurance, as it will not only protect us against an increase in the rate of premium during the three years, but positively saves us one-sixth over the rate we are now paying.' That was the conversation, in substance. Q. What did the doctor say, in substance, in response to that proposition? A. He agreed with my suggestion. Q. And was it a part of the proposal between you and the complainant that the Wagner Company should accept insurance for the three years stated? A. The question we had in our mind was whether he would be able to deliver us the policy for three years. We wanted it, and stood ready to take it. Our only fear was he would lay down on us, and not give it to us. Q. Mr. Smith, what you were looking for, and what Mr. Webb was looking for, was to have some contract which would protect the Wagner Company, was it not? A. Surely. Q. Did you not also wish to be in a position to cancel the insurance if you found you did not want the whole of it or part of it? A. Well, that question certainly did not cross my mind, and I don't think it did the president's. Q. Hasn't it been your practice, in drawing Wagner contracts, to, as far as possible, get a contract which would protect the company and give it what it wished, and at the same time not bind it too strongly to the other party to the contract? A. Well, that is a business policy, of course, to do that. Q. That has been the policy of the company, has it not? A. Why, surely, as far as it could be done honorably. Q. But your main purpose in making this contract was to bind the Wagner Company, if you could, to deliver the insurance during those years, if you wished it. Wasn't that your main purpose? A. Well, we did wish it, and that was our main purpose; yes."

May the complainant maintain this action in equity for the reformation of the contract of March 10, 1898? That is, as against the Pullman Company, may he have it reformed so as to express the intent and actual agreement of the parties thereto, assuming that the Pullman Company has obligated itself to perform the conditions thereby imposed, and that in fact there was a mutual mistake in drawing the agreement, as claimed? The contract of March 10, 1898, between the Agricultural Insurance Company and the Wagner Company, as written, imposed no obligation whatever on the Wagner Company to accept the renewal of insurance. As the contract existed in fact, and ought to have been written (the claim is), it did impose such an obligation, but of this omission or mistake the Pullman Company had no notice whatever when it entered into the agreement of Novem-

ber 8, 1899. The language of this last-mentioned agreement is as broad and comprehensive as well it could be when drawn in general terms, except it does not in terms contain an express agreement to execute all existing contracts of the Wagner Company. The Pullman Company, in consideration of the transfer to it of all the property, etc., of the Wagner Company, says:

"In order to enable said Wagner Company to make an immediate settlement of its affairs, and distribution of its assets, without the delay incident to the payment of its indebtedness and liabilities, said Pullman Company agrees that it will, as part of the transaction, satisfy and discharge the indebtedness and liabilities of said Wagner Company, of any and every kind, which may be unsatisfied at the time of the transfer of such assets."

And then follows an agreement to indemnify the Wagner Company and its trustees and shareholders.

Does this language cover an existing contract, not broken, or constitute an agreement to perform contracts by their terms to be performed thereafter by the Wagner Company, and, if so, was this agreement (fifth clause of the contract of November 8, 1899) made for the benefit of the creditors of said Wagner Company, and with their benefit as its object, or, as pertinent here, for the benefit (or would it inure to the benefit) of the promisees in such existing unbroken contracts made by the Wagner Company with third parties, with the benefit of such persons as its object, whereby it had agreed to do certain things in the future, but which after such dissolution it could not do? Was this contemplated by the parties? Was this their intent and purpose? Is the clause mentioned equivalent to an agreement to perform all the existing contracts of the Wagner Company made with third persons?

In Goodyear Shoe Machinery Co. v. Dancel, 119 Fed. 692, the Circuit Court of Appeals in this circuit (per Wallace, J.) held that where the defendant (in court below) purchased letters patent from the Goodyear Company, and, in the assignment thereof to it, expressly agreed in consideration thereof to assume all the obligations of the said Goodyear Company to pay a certain sum of money to Dancel, the plaintiff below, while such letters patent should remain in force, the effect of the agreement was to create the relation of principal and surety between the Goodyear Company, a Connecticut corporation, the original promisor, and the Goodyear Shoe Machinery Company, the defendant below, assignee of the Connecticut corporation, and as between those parties the defendant became primarily liable, and that in equity Dancel could have enforced the obligation of the Goodyear Machinery Company to pay such sum. The action having been brought by Dancel at law, the complaint was dismissed. The Goodyear Shoe Machinery Company took title to the letters patent from Dancel, the patentee, and in the assignment from Dancel there was this covenant:

"(1) That the Goodyear Company, in consideration of said assignment and of the agreements of said Dancel herein contained, doth agree to pay the said Dancel in each year while the United States letters patent No. 459,036 remain in force as a valid patent, the sum of $5,000 as an annuity, such annuity to be payable monthly in installments of $416⅔ each."

Judge Wallace said:

"The assignments of error also present the question whether the promise can be enforced against the present defendant. The complaint alleges that the defendant (a Maine corporation) purchased the letters patent from the Goodyear Company (a Connecticut corporation), and in an instrument of assignment to it, and in consideration thereof, agreed to assume all the obligations of the Goodyear Company to pay the annuity provided for in the contract between the latter and Dancel. This averment is admitted by the answer. The effect of this agreement was to create the relation of principal and surety between the defendant and the Connecticut corporation, and as between those parties the defendant became primarily liable for the obligations arising from the contract of the Goodyear Company with Dancel; and, upon the equitable doctrine that a creditor shall have the benefit by subrogation of any obligation or security given by the principal to the surety for the satisfaction of the debt, the plaintiffs, if this action had been brought in equity, would have been entitled to enforce the covenant of the defendant. According to the decisions in Second Nat. Bank of St. Louis v. Grand Lodge of Free & Accepted Masons of Missouri, 98 U. S. 123, 25 L. Ed. 75, Cragin v. Lovell, 109 U. S. 194, 3 Sup. Ct. 132, 27 L. Ed. 903, and Keller v. Ashford, 133 U. S. 610, 10 Sup. Ct. 494, 33 L. Ed. 667, the plaintiffs could not maintain an action at law against the defendant upon the covenant. The latter case was a bill in equity by a mortgagee against the grantee of the land subject to the mortgage, which mortgage the grantee had agreed to pay. It was held, after full examination of the authorities, that the mortgagor could not sue at law. It was also held that in equity, as at law, the contract of the purchaser to pay the mortgage, being made with the mortgagor and for his benefit only, created no direct obligation of the purchaser to the mortgagee; but it was also held that, upon the doctrine that the mortgagee was entitled as a creditor to the benefit of any obligation or security given by the purchaser to the mortgagor for the payment of the debt, he could enforce the agreement to pay the mortgage in a court of equity. The cases of Willard v. Wood, 135 U. S. 309, 10 Sup. Ct. 831, 34 L. Ed. 210, and Insurance Co. v. Hanford, 143 U. S. 187, 12 Sup. Ct. 437, 36 L. Ed. 118, are to the same effect."

In that case there is no question that the agreement between the Goodyear Company, a Connecticut corporation, and the Goodyear Shoe Machinery Company, a Maine corporation, was made for the benefit of Dancel and with him and his benefit as its object. In consideration of the assignment of the patent to the Connecticut corporation by Dancel, it agreed to pay him the sum fixed; and, in consideration of the assignment of the same patent by the Connecticut corporation to the Maine corporation, it agreed to assume all the obligations of said Connecticut corporation to pay said Dancel the sum falling due to him each year. This particular creditor and this particular obligation and its discharge was on the mind of the parties, and mentioned in the transfer. True, this holding in the Goodyear Case was not necessary to the decision of the case, as all that was necessary was a holding that Dancel could not maintain the action at law.

In Austin v. Seligman (C. C.) 18 Fed. 519, it was held:

"Although the subject is one of much controversy, the result of the better-considered decisions is that a third person may enforce a contract made by others for his benefit whenever it is manifest, from the nature or terms of the agreement, that the parties intended to treat him as the person primarily interested."

Such was the Goodyear Case.

Judge Wallace said:

"According to good sense and upon principle, there is no reason why a person may not maintain an action upon a contract, although not a party to it, when the parties to the contract intend that he may do so. The formal or immediate parties to a contract are not always the persons who have the most substantial interest in its performance. Sometimes a third person is exclusively interested in its fulfillment. If the parties choose to treat him as the primary party in interest, they recognize him as a privy in fact to the consideration and promise. And the result of the better-considered decisions is that a third person may enforce a contract made by others for his benefit whenever it is manifest from the nature or terms of the agreement that the parties intended to treat him as the person primarily interested. The cases of Hendrick v. Lindsay [93 U. S. 143, 23 L. Ed. 855] and Nat. Bank v. Grand Lodge [98 U. S. 123, 25 L. Ed. 75], and the expressions in the opinions, do not antagonize upon this proposition, but accord with it. The language of Folger, J., in Simson v. Brown, 68 N. Y. 355, may be adopted as a correct and accurate statement of the law, as follows: 'It is not every promise made by one to another, from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit as its object, and he must be the party intended to be benefited.' There is a class of cases where, under a contract between two persons, property has come to the hands of one of them which in equity is charged with a lien or trust in favor of a third person, in which the latter may sue in his own name upon the promise to discharge the lien or assume the trust. These cases have no proper application to a case like the present, where a copartnership transfers its assets to a purchaser, and the only interest of the plaintiff is that of a creditor at large of the selling partners. Such creditors have no lien for their debts upon the partnership assets, except in cases of insolvency or administration. Colly. Partn. § 894; Story, Partn. §§ 358, 360; Crippen v. Hudson, 13 N. Y. 161. If upon such a transfer the purchaser assumes to pay certain specified creditors or certain enumerated debts of the seller, it may be fairly urged that the parties contemplate a direct liability to the specified creditor on the part of the purchaser. On the other hand, when the agreement is silent respecting any specific obligation to be assumed to a third person, the natural inference is that it was intended primarily for the benefit of the promisee, and to adjust the rights and duties of the parties as between themselves."

In Constable v. National Steamship Company, 154 U. S. 73, 74, 14 Sup. Ct. 1062, 38 L. Ed. 903, the Supreme Court of the United States said:

"As observed by the Court of Appeals of New York in Simson v. Brown, 68 N. Y. 355: 'It is not every promise made by one to another, from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit, as its object, and he must be the party intended to be benefited.' See, also, National Bank v. Grand Lodge, 98 U. S. 123 [25 L. Ed. 75]; Garnsey v. Rogers, 47 N. Y. 233 [7 Am. Rep. 440]. The principle above announced was still further limited by the Court of Appeals in Vrooman v. Turner, 69 N. Y. 280 [25 Am. Rep. 195], in which it was said that, to give a third party, who may derive a benefit from the performance of a promise, an action, there must be, first, an intent by the promisor to secure some benefit to the third party; and, second, some privity between the two—the promisor and the party to be benefited—and some obligation or duty owing from the promisor to the latter, which would give him a legal or equitable claim to the benefit of the promise, or an equivalent to him personally."

In view of these cases, it would seem that the first question is, was this agreement of November 8, 1889, between the Wagner and Pull-

man Companies, made (as to this particular part of the contract) for the benefit of the third parties holding the obligations of the Wagner Company, and with their benefit as its object, or merely for the benefit and convenience of the parties named therein? The Wagner Company was about to dissolve—to cease to exist. For a valuable consideration its property of all descriptions was to pass to the Pullman Company, including contracts with railroad companies for the running of sleeping and other cars. The Pullman Company was to increase its capital stock, and deliver 200,000 shares thereof to the Wagner Company for distribution to its directors, as liquidating trustees, in full payment for such property and good will of the Wagner business. Pending the transfer no new contracts with railway companies were to be executed, and no unusual or extraordinary liability or expenditure was to be incurred, and no new officers were to be chosen, and no increase of compensation to officers or employés was to be made. The agreement then says:

"The intent of this provision [the fourth clause] is that the present condition of the assets, liabilities, obligations, contracts, and business arrangements of the company shall be preserved as it now is until such conveyance, so far as the same shall be consistent with the ordinary routine conduct of its business."

Then follows the provision by which the Pullman Company agrees that it will "satisfy and discharge the indebtedness and liabilities of said Wagner Company of any and every kind," as "a part of the transaction," which may be unsatisfied at the time of the transfer of the property.

It is clear that the creditors, etc., of the Wagner Company were incidentally intended to be benefited; but it is equally clear that the benefit of the two companies was equally intended—especially the benefit of the Wagner Company—and to relieve it from the delays incident to a payment and settlement of its obligations before a transfer of the property. In fact, this is the declared purpose and object of the assumption of these liabilities. It is not so clear that the object of this clause of the agreement was the benefit of these creditors of the Wagner Company at all, or that their interests were in the minds of the contracting parties. The property of the Wagner Company was not transferred to secure their payment, nor did they have a lien thereon. Still their interests and their benefit must have been in the minds of the contracting parties to some extent. Do the authorities go to the extent of holding that the benefit of these creditors, etc., of the Wagner Company, must have been the sole object of the agreement, or of the clause in question? The question is not free of doubt, but this court is of the opinion that it was not necessary to name the creditors, etc., of the Wagner Company, or specify their respective claims, their nature and amount, or that the benefit of such creditors should have been the sole object of this clause of the agreement.

In Coster v. The Mayor, 43 N. Y. 399, Folger, J., said, in discussing this subject:

"The ultimate beneficiary is uncertain. It is settled in this state that an agreement, made on a valid consideration, by one with another, to pay money

to a third, can be enforced by the third in his own name. [Citing cases.] * * * This was a promise made by the state for the benefit of any third person to whose property damage was caused. Nor is it an anomaly that the liability which the city assumes is not in existence at the date of its obligations, nor that the person who is to be benefited by it is not then known."

See, also, the following cases: Arnold v. Nichols, 64 N. Y. 117–119; Barlow v. Myers, 64 N. Y. 41, 21 Am. Rep. 582; Little v. Banks, 85 N. Y. 258; Vrooman v. Turner, 69 N. Y. 280, 25 Am. Rep. 195.

The consideration for the promise of the Pullman Company was the dissolution of the competing Wagner Company, and the transfer to it of all the assets, etc., of said company—the property to which the creditors of the Wagner Company would primarily look and resort for the payment of their claims. Can it be said that the creditors of the Wagner Company were strangers to this consideration?

But can this agreement be reformed—changed—the Pullman Company having had no notice of the alleged mistake when it assumed the payment or performance thereof?

The complainant cites Citizens' National Bank v. Judy, 146 Ind. 322, 43 N. E. 259. There it was said:

"Such mistake may not only be corrected against the mortgagor, but against subsequent purchasers with notice of the facts, and against judgment creditors of the mortgagor or such purchasers with notice. White v. Wilson, 6 Blackf. 448 [39 Am. Dec. 437], and authorities cited; * * * Gillespie v. Moon, 2 Johns. Ch. 585 [7 Am. Dec. 559]."

There is no evidence in this case that the Pullman Company at the time of the execution of the agreement of November 8, 1899, actually knew of the agreement between the Wagner Company and the Agricultural Insurance Company; and, while it may be assumed that this makes no difference, that the Pullman Company is presumed to have made inquiries, and to have ascertained the liabilities which they assumed, still it cannot be presumed it had notice of any mutual mistake in the making of that written agreement, or that it assumed a liability to have it so changed or reformed as to create a liability, when none existed by its terms. But the agreement of the Pullman Company goes further than a mere assumption of known and well-defined debts and liabilities. The Pullman Company agrees to "satisfy and discharge the indebtedness and liabilities of said Wagner Company of any and every kind which may be unsatisfied at the time of the transfer." Evidently it was the purpose of the parties to cover each and every debt owing and each and every liability incurred that might ripen into a cause of action, and to bind the Pullman Company to perform all the contracts of the Wagner Company. This is what the Pullman Company agreed to do. It took all the property and business of the Wagner Company, and assumed and agreed to perform all its contracts and pay and satisfy all its obligations.

When we consider the transaction broadly, and the sweeping effect of it in wiping out of existence the joint-stock company, and in taking possession of all its assets and assuming all its obligations, in order that there might be no delay in consummating the transaction, we find something more than a mere promise made by one to an-

other, for a consideration, to pay the debt of another. As part of the transaction, which in effect merged the two companies into one— the Pullman Company, for payment was made by an increase of the stock of the Pullman Company, and a distribution thereof to the shareholders in the Wagner Company—the Pullman Company assumed a relation in the nature of a trust towards the creditors, etc., of the Wagner Company, and became the surety, and in a sense the successor, of the Wagner Company. Surely every right existing in favor of third persons against the Wagner Company was preserved, and its discharge or satisfaction assumed by the Pullman Company. It is not sought to make a new contract or agreement, but to have the writing express the one already made and in existence; and it is within the terms of the agreement between the Wagner and Pullman Companies, "liabilities of said Wagner Company of any and every kind," etc. Here was, it is asserted, a liability to have this agreement reformed.

The conclusion is that the complainant can maintain this action in equity against the Pullman Company for the reformation of this agreement, if there was a mutual mistake of fact, and the contract, as drawn, failed to express the actual agreement of the parties thereto.

But has any such mutual mistake been proved? The burden of proof was on the complainant, and in such cases the evidence must be clear, convincing, and satisfactory. "The mistake must be clearly shown. If the proofs are doubtful and unsatisfactory, and if the mistake is not made entirely plain, equity will withhold relief." Baltzer v. R. Co., 115 U. S. 645, 6 Sup. Ct. 222, 29 L. Ed. 505. "The rule is well settled that an application to reform a written contract on the ground of accident or mistake must be supported by clear and satisfactory proof, otherwise it will not be granted. If the testimony is conflicting, or of such undecisive character as to raise a substantial doubt in the minds of the court, the contract as written must stand. Besides the ordinary burden of proof which rests upon every litigant who holds the affirmative of an issue, there is in this class of cases the additional burden of overcoming the strong presumption created by the contract itself which the proceeding seeks to reform." Harrison v. Hartford Fire Ins. Co. (C. C.) 30 Fed. 862, 863. "In an action for the reformation of a written instrument upon the ground of mistake, the party seeking the reformation must prove that there was a mistake by evidence that is clear, positive, and convincing. It is to be presumed that the written instrument was carefully and deliberately prepared and executed, and therefore is evidence of the highest character, and will be regarded as expressing the intention of the parties to it until the contrary appears in the most satisfactory manner." Christopher & Tenth St. R. Co. v. Twenty-Third St. Ry. Co., 149 N. Y. 51, 58, 43 N. E. 538, 539 (opinion of the court, per Martin, J.). "Before such relief [i. e., reformation] can be granted, however, the party invoking the interference of the court must show with entire clearness that the mistake alleged has been made, and that it was mutual; that is, it must clearly be shown that the minds of the parties had met as to certain matters, and that the paper, as written, failed to express that agreement." Gray, Circuit Judge, for

Circuit Court of Appeals in Third Circuit, in Fulton v. Colwell, 112 Fed. 831, 836, 50 C. C. A. 537, 542.

The complainant, Charles S. Barker, as the agent for the Agricultural Insurance Company, his assignor in this action, had all his negotiations with F. G. Smith, who was the private secretary of Dr. W. S. Webb, then president of the Wagner Company. Smith had no power whatever to make a contract, and what the agreement actually was is to be determined by what was put in the written agreement, and by what was communicated to Webb and assented to by him, not by the conversation that took place between the complainant and Smith. Not the meeting of the minds of Smith and Barker, but the meeting of the minds of the duly authorized representatives of the Wagner Company and the Agricultural Company, is the material consideration here. It is material and necessary, therefore, to ascertain and determine what proposed contract or agreement was presented to the mind of Dr. Webb, the president of the Wagner Company, and how much thereof he assented to in behalf of the Wagner Company.

It appears from the evidence that Smith had heard that rates of insurance were to be increased. The Wagner Company was desirous of protecting itself by making an agreement for insurance of some character for three years. Barker waited upon Smith, and told him that, if Webb would give a three-years contract for placing the insurance, he would do it for 2½ years' premium, thereby saving nearly one-sixth of the premium, or reducing the rate from 35 cents to 29.17 cents per $100 worth of insurance. Smith merely said that he thought this a good idea. Smith communicated something to Webb—what, does not appear—and Webb replied, let the matter rest until he reached home. Barker said that in March he had a further conversation with Smith, and that the subject of discussion was the reduction of the premium on the agreement of the Wagner Company to take insurance for three years. He does not say that any agreement was made to that effect, but he does say that Smith asked if he wanted a contract; that he (Barker) said he did; and that Smith thereupon drew up a rough sketch of a contract, and asked Barker if that was about what he wanted. Barker read it over, and told him it was. Smith then said he would have it typewritten and forward it to Webb, and would have Webb sign it. Barker is an intelligent man, and was accustomed to doing insurance business, and probably understood what an agreement would be or should be on the part of the Wagner Company to accept the insurance offered. Later Barker called again on Smith, who handed the agreement, previously drawn, to Barker, and told Barker that Webb had signed it, and that it awaited the signature of Barker. Webb had signed the agreement. A duplicate of that agreement, made by some one, was signed, "Agricultural Insurance Company, Charles F. Barker, Agent." Barker must have seen this written contract on at least three different occasions, and must have read it at least three different times. Barker's statement that he had no part whatever in the preparation of the written contract cannot be accepted as stating the fact as it was, as he was present when it was drawn, and saw it after it was reduced to writing. He read it over

in the office of Smith. He then gave it to Smith, in whose presence he signed it. Barker says that he took the duplicate, and had it in his possession, except that he took it to Watertown, and left it in the possession of the Agricultural Insurance Company for some time. Barker says that at the time the written agreement was drawn he made suggestions only as to the terms of payment. Barker says he took the original of the contract to Watertown, and left it there three or four days, and that he showed it to the president and secretary of the Agricultural Insurance Company, and that they looked at it, and that then he brought it back with him and kept it in his safe. Barker further says that the president and secretary of the Agricultural Insurance Company made no objection to this written contract as it was drawn. Further on in his testimony, Barker testifies to going to Chicago and communicating with certain officers of the Pullman Company, and that they told him the contract would be lived up to, etc. There is nothing in these conversations that concedes any mutual mistake in the written contract, and nothing that indicates that the Pullman Company admitted that any contract was in existence, except the one found in the writing. Violence would be done to the intelligence of the president and secretary of the Agricultural Insurance Company, should we say that on reading that written contract they supposed it contained a covenant on the part of the Wagner Company to accept the insurance when tendered. They examined and they assented to a written agreement by which they offered to write a renewal of certain insurance at certain rates. In the exercise of ordinary intelligence, they must have observed that the written agreement contained no covenant on the part of the Wagner Company to accept that insurance. If they relied upon an implied covenant, it was a mistake of law, and not of fact.

We now come to a consideration of what was communicated by Smith to Webb. Smith says that he submitted the written agreement to Webb in the form in which it was executed. This question was put to the witness by counsel for the complainant:

"Q. In that conversation with the president of the Wagner Company, did you say that the Wagner Company was to take insurance for three years, and secure an agreement from the Agricultural Insurance Company to furnish it for three years, in substance?"

This question is leading and suggestive. The witness says in reply to that question:

"Why I certainly said the substance of that, for the reason that the whole intent of our getting that three years' insurance was that it saved us one-sixth of the premium we were paying. It was the lowest insurance we had ever had, and by agreeing to take it for three years we certainly did save one-sixth of our regular premium, which was quite a sum of money. We were well pleased."

Then he says:

"I said to Dr. Webb, 'We had better take this three years' insurance, as it will not only protect us against an increase in the rate of premium during the three years, but positively saves us one-sixth over the rate we are now paying.' That was the conversation, in substance."

Then this question was put:

"And was it a part of the proposal between you and the complainant that the Wagner Company should accept insurance for the three years stated?"

The answer to this question is:

"The question we had in our mind was whether he would be able to deliver us the policy for three years. We wanted it, and stood ready to take it. Our only fear was, he would lay down on us, and not give it to us."

Then:

"Q. Mr. Smith, what you were looking for, and what Mr. Webb was looking for, was to have some contract which would protect the Wagner Company, was it not?"

The answer is, "Surely."

It is impossible to find in this any specific oral agreement on the part of Dr. Webb to take this insurance, or to assent to a written agreement containing a covenant to accept the insurance and pay the premium. Webb was seeking to protect his company, which was as well done by having the agreement as it is as would have done by putting in a covenant binding the Wagner Company to accept the insurance.

The testimony of the witness Smith that Webb agreed with his suggestion that they had better take this three years' insurance, as it would protect them (the Wagner Company) against an increase in the rate of premium during the three years, and positively save them one-sixth of the rate they were then paying, does not establish an agreement between Webb and Barker to accept the insurance. Barker was not present, and Webb's approval of, or acquiescence in the wisdom of, such a suggestion, is not proof that it was ever agreed to put a clause in the written agreement binding the Wagner Company to accept. These were expressions of opinion. No statement was made that a clause to that effect should go in the proposed agreement, which was then in writing and being discussed. All that was said had reference to the written agreement then under consideration, and which had been drawn up before that time, and was then submitted to Webb for his approval and signature. There is no suggestion of any proposed change in the writing as drawn. The officers of both companies had it, read it, and assented to it. Webb accepted the offer made in writing, but did not agree to accept and pay the premium. Well might he say it is wise to accept this offer made in writing, which he had before him, and so protect the company, so long as it imposed no obligation to accept. It is urged that the agreement, as drawn and executed, is one-sided. This may be, but this fact does not establish a different agreement or a mutual mistake of the parties. There is no suggestion that the agreement was hastily drawn or executed. There is no suggestion that it was executed in any but a deliberate manner after full consideration, and with a full understanding of its terms. This court cannot find from the evidence before it that there was a mutual mistake by which the provision sought to be inserted, in substance or effect, was omitted.

The bill of complaint must be dismissed, with costs, and it is so ordered.